UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CHEN XIA LIU et al.,

                               Plaintiffs,

        -against-

HOK KWAI CHAU et al.,

                            Defendants.
----------------------------------------------------------------X

Case No. 20-cv-6369(FB)(TAM)

**DEFENDANT WING FUNG GROUP INC RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR DOCUMENTS**

       Defendant WING FUNG GROUP INC. ("Defendant" or "Responding Party') submits the following responses and objections to Plaintiffs CHEN XIA LIU and CHEN HUA LIU ("Plaintiffs" or "Propounding Party") First Requests for Production of Documents:

       Responding Party has not fully completed its investigation of the facts relating to the allegations contained in the Complaint(s), has not fully completed its discovery in this action, and has not completed its preparation for trial.  All of the responses contained herein are based only upon such information and documents which are presently available to and specifically known to Responding Party.  It is anticipated that further discovery, independent investigation, legal research and analysis will provide additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to and changes on the responses set forth herein.

       2.     The following responses are given without prejudice to Responding Party's right to produce evidence of any subsequently discovered facts which Responding Party may later recall. Responding Party reserves the right to change and/or supplement any and all answers provided herein as additional facts are ascertained, analysis made, legal research conducted, and contentions developed.

3. The following responses are made solely for the purpose of, and in relation to, this action. Each response is given subject to all appropriate objections (including, but not limited to, competency, relevancy, materiality and admissibility) which would require exclusion of any statement contained in these responses made by a witness testifying in court or at any other proceeding. All such objections are therefore reserved and may be interposed at the time of trial or other proceedings.

4. Except for facts explicitly admitted herein, no incidental or implied admission of any nature whatsoever are intended thereby. The fact that any request herein has been answered should not be taken as an admission, acceptance, or concession of the existence of any facts set forth or assumed by such request, or that such answer constitutes admissible evidence or evidence of any fact thus set forth or assumed. All questions which assume facts are objected to on that basis and any answer provided thereto is provided without waiving such objection. The fact that the parties on whose behalf these answers are given has answered part or all of a request is not intended and should not be construed as a waiver by the Responding party of all or any part of any objection to any request.

5. Responding party objects to each request which seeks information protected under the attorney-client privilege and/or the attorney work product doctrine. Further objection on the grounds of being unduly burdensome and oppressive is made to all requests which seek documents equally available to Propounding Party.

6. Responding Party objects to Propounding Party's definitions and instructions to the extent they impose a greater burden upon Responding Party than authorized by the applicable Federal Rules of Civil Procedure ("FRCP").

7. This preliminary statement is integrated in its entirety in each of the responses set forth below.

## <u>GENERAL OBJECTIONS</u>

Responding Party responds to each and every request for documents subject to the General Objections set forth below.  These limitations and objections form a part of the response to each and every request for documents and are set forth herein to avoid the duplication and repetition of restating them for each response.  Although these General Objections may be specifically referred to in a response to certain requests for admissions, documents and/or interrogatories for the purpose of clarity, the failure to specifically incorporate a General Objection should not be construed as a waiver of same.

1.      Responding Party objects to each request for admission and documents to the extent that it seeks information and/or documents that are neither relevant to Plaintiffs' claim(s) or Defendants' defense(s), relevant to the subject matter involved in the action, nor reasonably calculated to lead to the discovery of admissible evidence.  The number of requests and the subject matter of the requests are disproportionate to the dispute and beg the question of why costs to respond to these should not be borne by the requesting party.

2.      Responding Party objects to each request for admission and documents to the extent that it is vague, ambiguous, cumulative, duplicative, overly board, unduly burdensome or oppressive, or seeks information or documents that are not relevant to the claims or defenses of any party or to the subject matter involved in this action, or to the extent that it seek documents or information beyond those permitted by the FRCP and/or other applicable laws.

3

3.      By objecting and/or responding to each request for admission or documents, Responding Party does not in any way waive or intend to waive:  (a) any objections as to competency, relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any information or documents that may be produced in response to the requests for documents; (b) any objections as to the vagueness, ambiguity, or other infirmity in the form of any request for documents; (c) any objections based on the undue burden imposed by any request for documents; (d) any objections to the use of the documents or information that may be produced in response to the request for documents at any hearings or at trial; (e) any objections to any further request for documents involving or relating to the subject matter of the request for documents; and (f) any privileges, rights, or immunity under the FRCP and/or other applicable laws.

4.      No objection made herein, or lack thereof, is an admission by Responding Party as to the existence or non-existence of any information.

5.      Responding Party reserves its right to amend, supplement, and/or withdraw any objection and/or response set forth herein on the basis of documents or information found during its investigation or any discovery that might be taken in this action.  Responding Party expressly reserves its right to rely, at any time, including at trial, upon subsequent discovered documents or information, or information omitted from any response as a result of mistake, oversight, or inadvertence.

6.     Responding Party objects to each request for admission and documents to the extent that it imposes or purports to impose discovery obligations greater than, or inconsistent with, Responding Party's obligations under the FRCP and/or other applicable laws, and to the extent that Plaintiff seeks discovery beyond that permitted by such law.

7.     Responding Party objects to each request for documents to the extent that it seeks information or documents protected from disclosure by the attorney-client privilege, the work-product doctrine, privacy rights, or other applicable privilege, immunity, or protection against disclosure. Responding Party further objects to each request for documents to the extent that it seeks disclosure of legal conclusions or the mental impressions of counsel.

8.     Responding Party objects to each request for admission and documents to the extent that it seeks the production of proprietary or commercially-sensitive information and/or trade secrets, including, but not limited to, confidential or proprietary research, procedures, manuals, and/or processes relating to client list, supplier list and current and past business planning and financial information. Responding Party's production of any document or provision of information pursuant to these requests for documents and/or interrogatories shall not be construed as a waiver of confidentiality of any such document or information.

9.      Responding Party objects to each request for admission and documents to the extent that it requires Responding Party to disclose information or produce documents outside of Responding Party's possession, custody, or control, and/or no longer in existence, to seek information about or produce documents from persons not currently employed or associated with Responding Party, and/or to provide or search for information or produce documents in the possession, custody, or control of non-parties, including former employees.

10.     Responding Party objects to each request for admission or documents to the extent that it seeks information or documents already in Plaintiffs' possession, custody, and/or control.  Responding Party further objects to each request for documents to the extent that it requires Responding Party to search for information publicly available, or to search for information or documents for which the burden of deriving or ascertaining the information or documents is substantially the same or less for Plaintiff as it is for Responding Party.

11.     Responding Party objects to each request for admission or documents to the extent that is duplicative of cumulative of other discovery requests propounded by Plaintiff.

12.     Responding Party objects to any implications and to any explicit or implicit characterizations of facts, events, circumstances, or issues described in the requests for documents and/or interrogatories.   Responding Party's response to and/or production of documents or information connection with a particular request for documents is not intended to indicate that Responding Party agrees with any implication or any explicit or implicit characterization of facts, events, circumstances, or issues described in the request for documents, or that such implication or characterization are relevant to this action.

13.     The information produced in response to these requests for admission and documents and/or interrogatories is for use in this litigation and for no other purpose, and may not be shared with any non-party to this action absent express permission.

14.     Responding Party objects to each Instruction to the extent that it imposes or purports to impose discovery obligations greater than, or inconsistent with, Responding Party's obligations under the FRCP and/or other applicable laws, and to the extent that plaintiff seeks discovery beyond that permitted by such law.

15.     Responding Party objects to each Definition to the extent that it imposes or purports to impose discovery obligations greater than, or inconsistent with, Responding Party's obligations under the FRCP and/or other applicable laws, and to the extent that Plaintiffs seek discovery beyond that permitted by such law.

<u>**SPECIFIC OBJECTIONS AND RESPONSE**</u>

<u>Request No. 1:</u>
Copies of all checks received by YOU from either or both of the Plaintiffs.
Response:  subject to the foregoing objections, none.

<u>Request No. 2:</u>
Copies of all checks received by 41-23 Haight Realty Inc. from either or both of the Plaintiffs.
Response:  subject to the foregoing objections, none.

<u>Request No. 3:</u>
Copies of any and all mortgage applications and guaranties signed by YOU and provided, directly
and indirectly With Axos Bank.
Response:  subject to the foregoing objections, none.

<u>Request No. 4:</u>
Copies of any and all documents provided by YOU, directly and indirectly to Axos Bank.
Response:  subject to the foregoing objections, none.

<u>Request No. 5:</u>
All written communications by and between YOU and Bo Jin Zhu between June 1, 2010 and the
present date concerning 41-23 Haight Realty Inc. and any real property which was owned by 4123
Haight Realty Inc.
Response:  subject to the foregoing objections, none.

<u>Request No. 6:</u>
All contracts of sale and/or purchase agreements executed by YOU concerning any real property that
was purchased by, sold by, and/or owned by 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

<u>Request No. 7:</u>
All written communications, including but not limited to emails, text messages, what's app and/or
wechat by and between YOU and Defendant Victor Tsai, Esq. transmitted between June 1, 2010 and
the present date.
Response:  in addition to the foregoing objections, objection based on attorney-client privilege.

Request No. 8:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant WING FUNG CHAU a/k/a ANDY CHAU transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Wing Fung Chau.

Request No. 9:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant SALENA CHAU transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Salena Chau.

Request No. 10:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant MEI YANG KO transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Mei Yang Ko.

Request No. 11:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Xue Mei Chen transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Xue Mei Chen.

Request No. 12:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Zi Zhen Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Zi Zhen Chen.

Request No. 13:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Yi Shou Jiang transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Yi Shou Jiang.

Request No. 14:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Inga Xue Hua Liu transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Inga Xue Hua Liu.

Request No. 15:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Mei Yan Liu transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Mei Yan Liu.

Request No. 16:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Ken Cheng transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Ken Cheng.

Request No. 17:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Xian Kang Zhang transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Xian Kang Zhang.

Request No. 18:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Yu Qing Wang transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Yu Qing Wang.

Request No. 19:  All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Zi Ying Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Zi Ying Chen.

Request No. 20:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Min Dong Weng transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Min Dong Weng.

Request No. 21:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Jian Feng LLC and any of their officers, shareholders or employees transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Jian Feng LLC.

Request No. 22:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Shi Yong Lin transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Shi Yong Lin.

Request No. 23:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Bing Wen Lin transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Bing Wen Lin.

Request No. 24:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Xiu Chen transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Xiu Chen.

Request No. 25:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Feng Lin transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Feng Lin.

Request No. 26:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Lam Kam Ho Holand Development LLC and any of their officers, shareholders or employees transmitted between August 8, 2019 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Lam Kam Ho Holand Development LLC.

Request No. 27:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Yungwa Ho transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Yungwa Ho.

Request No. 28:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Rihong Zhang transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Rihong Zhang.

Request No. 29:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant YBL NY Inc. and any of their officers, shareholders or employees transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between YBL NY Inc.

Request No. 30:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Chun Yin Chen transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Chun Yin Chen.

Request No. 31:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Yi Shou Jiang transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Yi Shou Jiang.

Request No. 32:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Mei Fung Stella Leung transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Mei Fung Stella Leung.

Request No. 33:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Xing Ju Lin transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Xing Ju Lin.

Request No. 34:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Mei Yan Liu transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, there were no written communication between Mei Yan Liu.

<u>Request No. 35:</u>

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Rui Jin Wang transmitted between June 1, 2010 and the present date.

Response: in addition to the foregoing objections, there were no written communication between Rui Jin Wang.

<u>Request No. 36:</u>

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Xiu Qin Shi a/k/a Amy Shi transmitted between June 1, 2010 and the present date.

Response:  Response:  subject to the foregoing objections, Wing Fung Group will produce any responsive documents in its possession.

<u>Request No. 37:</u>

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Mei Yang Ko transmitted between June 1, 2010 and the present date.

Response:  in addition to the foregoing objections, there were no written communication between Mei Yang Ko.

<u>Request No. 38:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Salena Chau transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Salena Chau.


<u>Request No. 39:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Chun Yin Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Chun Yin Chen.


<u>Request No. 40:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Dongmei Li transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Dongmei Li.


<u>Request No. 41:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Yimin Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Yimin Chen.

<u>Request No. 42:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Bo Jin Zhu transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Bo Jin Zhu.


<u>Request No. 43:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Tu Kang Yang transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between Tu Kang Yang.


Request No. 44:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Victor Tsai transmitted between June 1, 2010 and the present date.
Response:  in addition to the foregoing objections, objection based on attorney client privilege.


Request No. 45:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Defendant Hok Kwai Chau transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Hok Kwai Chau.


Request No. 46:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and ZLZ 33 Inc. and any of their officers, shareholders or employees transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between ZLZ 33 Inc.

Request No. 47:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Zi Ying Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Zi Yang Chen.


Request No. 48:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Queens Abstract Company, Inc. and any of their officers, shareholders or employees transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Queens Abstract Company Inc.

<u>Request No. 49:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and AXOS Bank and any of their officers, shareholders or employees transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between AXOS bank.


<u>Request No. 50:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Sunflu Condominium Inc. and any of their officers, shareholders, employees or managing agents, transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Sunflu Condominium.



<u>Request No. 51:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Tina Tang transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Tina Tang.


<u>Request No. 52:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Biao Chen transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Biao Chen.


<u>Request No. 53:</u>
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Chum Sun Cheng transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Chum Sun Cheng.

Request No. 54:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Ji Juan Lin transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Ji Juan Lin.

Request No. 55:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Amy Johnson transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Amy Johnson.

Request No. 56:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Wen Mei Wang transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Wen Mei Wang.

Request No. 57:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Plaintiff CHEN XIA LIU transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Chen Xia Liu.

Request No. 58:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Plaintiff CHEN HUA LIU transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Chen Hua Liu.

Request No. 59:
All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and Jianyuan Yang transmitted between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication between Jianyuan Yang.

Request No. 60:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and Golden Urban Property
Management LLC and any of their officers, shareholders or employees transmitted
between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication
between Golden Urban Property Management LLC.

Request No. 61:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and WLZ New York LLC, and/or
from officers, members or employees of WLZ New York LLC transmitted between
June 1, 2010 and the present date.
 Response:  subject to the foregoing objections, there were no written communication
between WLZ New York LLC.

Request No. 62:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and Zhong You Wang transmitted
between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication
between Zhong You Wang.

Request No. 63:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and Xiu Chai Lu transmitted between
June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication
between Xiu Chai Lu.

Request No. 64:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and Wei X. Chen transmitted
between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication
between Wei X. Chen.

Request No. 65:
All written communications, including but not limited to emails, text messages,
what's app and/or wechat by and between YOU and Li Fang Zheng transmitted
between June 1, 2010 and the present date.
Response:  subject to the foregoing objections, there were no written communication
between Li Fang Zheng.

Request No. 66:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and LDWS LLC and/or from officers, members or employees of LDWS LLC transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between LDWS LLC.

Request No. 67:

All written communications, including but not limited to emails, text messages, what's app and/or wechat by and between YOU and T.8.J. LLC and/or from officers, members or employees of T.8.J. LLC transmitted between June 1, 2010 and the present date.

Response:  subject to the foregoing objections, there were no written communication between T.8.J. LLC.

Request No. 68:

Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Wen Mei Wang as purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Wen Mei Wang.

Request No. 69:

Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Xian Kang Zhang as purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Xian Kang Zhang.

Request No. 70:

Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Yu Qing Wang as purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Yu Qing Wang.

Request No. 71:

Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Norman Lee as purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Norman Lee.

<u>Request No. 72:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and T.8.J. LLC as purchaser or
buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or T.8.J. LLC.

<u>Request No. 73:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Xue Hua Liu as purchaser
or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or Xue Hua Liu.

<u>Request No. 74:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Xue Fei Liu as purchaser
or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or Xue Fei Liu.

<u>Request No. 75:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Li Fang Zheng as
purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or Li Fang Zheng.

<u>Request No. 76:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Wei X. Chen as purchaser
or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or Wei X. Chen.

<u>Request No. 77:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Zi Ying Chen as purchaser
or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase
agreements between 41-23 Haight Realty Inc or Zi Yang Chen.

<u>Request No. 78:</u>
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and Min Dong Weng as
purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Min Dong Weng.

Request No. 79:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Jian Feng LLC as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Jian Feng LLC.

Request No. 80:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Shi Yong Lin as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Shi Yong Lin.

Request No. 81:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Bing Wen Lin as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Bing Wen Lin

Request No. 82:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Xiu Chen as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Xiu Chen.

Request No. 83:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Feng Lin as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Feng Lin.

Request No. 84:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Lam Kam Development LLC as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Lam Kam Development LLC.

Request No. 85:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Yungwa Ho as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Yungwa Ho.

Request No. 86:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Grand Investment LLC as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Grand Investment LLC.

Request No. 87:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Rihong Zhang as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Rihong Zhang.

Request No. 88:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Marisa Wong as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Marisa Wong.

Request No. 89:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Marcus Wong as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Marcus Wong.

Request No. 90:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Yi Shou Jiang as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Yi Shou Jiang.

Request No. 91:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Mei Fund Stella Leung as purchaser or buyer.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Mei Fund Stella Leung.

Request No. 92:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Rui Jin Wang as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Rui Jin Wang.

Request No. 93:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Chen Xia Liu as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Chen Xia Liu.

Request No. 94:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Wei Zhu as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Wei Zhu.

Request No. 95:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Chen Hua Liu as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Chen Hua Liu.

Request No. 96:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as seller and Chun Yin Chen as purchaser or buyer.
Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or Chun Yin Chen.

Request No. 97:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on your behalf between 41-23 Haight Realty Inc. as purchaser or buyer, and DW Haight Street Owners LLC and/or TL Property Owners LLC as seller or sellers.

Response:  subject to the foregoing objections, no contracts of sale or purchase agreements between 41-23 Haight Realty Inc or TL Property Owners LLC.

Request No. 98:
Copy of all documents signed by YOU or signed on your behalf between 41-23 Haight
Realty Inc. and Global Bank regarding the real property which was at anytime owned
by 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, no documents with Global Bank or 41-23
Haight Realty Inc.

Request No. 99:
Copy of all documents signed by YOU or signed on your behalf between 41-23 Haight
Realty Inc. and Cathay Bank regarding the real property which was at anytime owned
by 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, no documents with Cathay Bank or 41-23
Haight Realty Inc.

Request No. 100:
Copy of all documents signed by YOU or signed on your behalf between 41-23
Haight Realty Inc. and G4 18171 LLC regarding the real property which was at
anytime owned by 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, no documents with G4 18171 LLC or 41-
23 Haight Realty Inc.

Request No. 101:
Copy of all contracts of sale and/or purchase agreements signed by YOU or signed on
your behalf between 41-23 Haight Realty Inc. as seller and xxx as purchaser or buyer.
Response:  subject to the foregoing objections and unknown "xxx", no documents with
"xxx" or 41-23 Haight Realty Inc.

Request No. 102:
Copy of any real estate brokers license held by YOU between June 1, 2010 and the
present date.
Response:  subject to the foregoing objections, Wing Fung Group will produce any
responsive documents in its possession.

Request No. 103:
Copy of any real estate salespersons license held by YOU between June 1, 2010 and
the present date.
Response:  subject to the foregoing objections, Wing Fung Group will produce any
responsive documents in its possession.

Request No. 104:
Copies of all documents which YOU submitted, or caused to be submitted to the New
York State Department of Law in connection with 64-03 Realty LLC, the sponsor of
the Wing Fung Plaza Condominium located at 64-05 Woodside Avenue, Woodside,
New York pursuant to a condominium offering plan accepted for filing by the New
York State Department of Law as File No. CD-13-0044 on August 12, 2013.
Response:  subject to the foregoing objections, see attached.

Request No. 105:

Copies of the condominium offering plan and all amendments thereto submitted to the New York State Department of Law for the Wing Fung Plaza Condominium located at 64-05 Woodside Avenue, Woodside, New York pursuant to a condominium offering plan accepted for filing by the New York State Department of Law as File No. CD-13-0044 on August 12, 2013.

Response:  subject to the foregoing objections, see attached.

Request No. 106:

Copies of all documents which YOU, or someone on your behalf executed for 8225 Queens Mansion LLC to convey title the condominium units known as Condominium Units # PS4, PS5, PS8 and PS9 to Dongmei Li on or about February 20, 2019 by deeds recorded in the office of the New York City Register on February 26, 2019 for no consideration.

Response:  subject to the foregoing objections, see attached.

Request No. 107:

Copies of all documents showing payment from Dongmei Li or any third party to YOU or to 8225 Queens Mansion LLC in connection with the conveyance of Condominium Units # PS4, PS5, PS8 and PS9 to Dongmei Li on or about February 20, 2019 by deeds recorded in the office of the New York City Register on February 26, 2019.

Response:  subject to the foregoing objections, see attached.

Request No. 108:

Copies of all documents which YOU submitted, or caused to be submitted to the New York State Department of Law in connection with 8225 Queens Mansion LLC, the sponsor of the Queens Mansion Condominium located at 82-23 Queens Boulevard, Elmhurst, New York pursuant to a condominium offering plan accepted for filing by the New York State Department of Law as File No. CD-12-0157 on February 15, 2013.

Response:  subject to the foregoing objections, see attached.

Request No. 109:

Copies of the condominium offering plan and all amendments thereto submitted to the New York State Department of Law for the Queens Mansion Condominium located at 82-23 Queens Boulevard, Elmhurst, New York pursuant to a condominium offering plan accepted for filing by the New York State Department of Law as File No. CD-12-0157 on February 15, 2013.

Response:  subject to the foregoing objections, see attached.

Request No. 110:
Copies of all executed purchase agreements and/or executed contracts of sale for the sale of condominium unit 2C in the Wing Fung Plaza Condominium.
Response: subject to the foregoing objections, see attached.

Request No. 111:
Copies of all executed purchase agreements and/or executed contracts of sale for the sale of condominium unit 2D in the Wing Fung Plaza Condominium.
Response: subject to the foregoing objections, see attached.

Request No. 112:
Copies of all executed purchase agreements and/or executed contracts of sale for the sale of condominium unit 3E in the Wing Fung Plaza Condominium.
Response: subject to the foregoing objections, see attached.

Request No. 113:
Copies of all executed purchase agreements and/or executed contracts of sale for the sale of condominium unit 4D in the Wing Fung Plaza Condominium.
Response: subject to the foregoing objections, see attached.

Request No. 114:
Copies of all executed purchase agreements and/or executed contracts of sale for the sale of condominium unit 4E in the Wing Fung Plaza Condominium.

Request No. 115:
Copies of all executed purchase agreements and/or executed contracts of sale and closing documents for the sale of Unit 2D in the Wing Fung Plaza Condominium from 64-03 Realty LLC to WENDY CHAU.

Request No. 116:
Copies of all documents which YOU, or someone on your behalf executed for or between Flushing Point Holding LLC as a grantor or grantee of real property.
Response: subject to the foregoing objections, no documents between Flushing Point Holding LLC.

Request No. 117:
Copies of all documents which YOU, or someone on your behalf executed for or between Flushing Point LLC as a grantor or grantee of real property.
Response: subject to the foregoing objections, no documents between Flushing Point Holding LLC.

Request No. 118:
Copies of all documents which YOU, or someone on your behalf executed for or between Flushing Point Holding (DE) LLC as a grantor or grantee of real property.

Response:  subject to the foregoing objections, no documents between Flushing Point
Holding (DE) LLC.

Request No. 119:
Copies of all documents transmitted by YOU, or anyone on your behalf to, or
received from the New York State Department of Law between February 5, 2010 and
the present date.
Response:  subject to the foregoing objections, see attached.

Request No. 120:
Copies of any and all documents signed by YOU and provided, directly and indirectly
to the New York City Department of Housing Preservation and Development
regarding Wing Fung Plaza Condominium.
Response:  subject to the foregoing objections, no documents between NYC HPD.

Request No. 121:
Copies of any and all applications for tax exemption or tax abatement benefits
provided by you, directly and indirectly to the New York City Department of Housing
Preservation and Development regarding Wing Fung Plaza Condominium.
Response:  subject to the foregoing objections, no documents between NYC HPD.

Request No. 122:
Copies of all documents which YOU submitted, or caused to be submitted to the New
York State Department of Law in connection with 88 Canal Realty Inc., the sponsor
of the 86 Canal Condominium, located at 86 Canal Street, New York, New York
pursuant to a condominium offering plan accepted for filing by the New York State
Department of Law as File No. CD-160059 on February 16, 2016.
Response:  subject to the foregoing objections, see attached.

Request No. 123:
Copies of the condominium offering plan and all amendments thereto submitted to the
New York State Department of Law for the 86 Canal Condominium, located at 86
Canal Street, New York, New York pursuant to a condominium offering plan
accepted for filing by the New York State Department of Law as File No. CD-16-
0059 on February 16, 2016.
Response:  subject to the foregoing objections, see attached.

Request No. 124:
Copies of all documents which YOU, or someone on your behalf executed for 88 Canal
Realty Inc. to convey title to 94 Canal Realty LLC of the condominium units known as
Condominium Unit # M1, S1, S6, S7, S8, 6A, 6D, 7D on September 30, 2019 by deeds
recorded in the office of the New York City Register on October 16, 2019.

Response:  subject to the foregoing objections, Wing Fung Group will produce any responsive documents in its possession.

Request No. 125:
Copies of all documents showing payment from 94 Canal Realty LLC or any third party to YOU or to 88 Canal Realty Inc. in connection with the conveyance of Condominium Unit # M1, S1, S6, S7, S8, 6A, 6D, 7D on September 30, 2019 by deeds recorded in the office of the New York City Register on October 16, 2019.
Response:  subject to the foregoing objections, no documents between 94 Canal Realty LLC or third-party or 88 Canal Realty Inc.
Response:  subject to the foregoing objections, Wing Fung Group will produce any responsive documents in its possession.


Request No. 126:
Copies of all documents which YOU, or someone on your behalf executed for 88 Canal Realty Inc. to convey title to Rong Fu Chen and Yan Mei Wu of the condominium unit known as Condominium Unit # 12A on May 22, 2019 by deed recorded in the office of the New York City Register on June 4, 2019.
Response:  subject to the foregoing objections, no documents between 88 Canal Realty Inc. or Rong Fu Chen and Yan Mei Wu.

Request No. 127:
Copy of any checks paid from 41-23 Haight Realty Inc. to YOU between February 5, 2010 and the present date.
Response:  subject to the foregoing objections, no check from 41-23 Haight Realty Inc.

Request No. 128:
Copy of any checks paid by YOU to 41-23 Haight Realty Inc. between February 5, 2010 and the present date.
Response:  subject to the foregoing objections, no checks to 41-23 Haight Realty Inc.

Request No. 129:
Copy of any wire transfers from 41-23 Haight Realty Inc. to YOU between February 5, 2010 and the present date.
Response:  subject to the foregoing objections, no wire transfers from 41-23 Haight Realty Inc.

Request No. 130:
Copy of any wire transfer checks from YOU to 41-23 Haight Realty Inc. between February 5, 2010 and the present date.
Response:  subject to the foregoing objections, no wire transfer to 41-23 Haight Realty Inc.

Request No. 131:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-05 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 132:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-07 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 133:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-09 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 134:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-11 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 135:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-13 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 136:

Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-15 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.

Response:  subject to the foregoing objections, none.

Request No. 137:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-17 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 138:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-19 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 139:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-21 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 140:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-23 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 141:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-25 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 142:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-27 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 143:
Copy of any and all personal guaranties that YOU signed in favor of the person or entity that executed a contract of sale or purchase agreement to purchase the real property located at 41-31 Haight Street, Flushing, New York from 41-23 Haight Realty Inc.
Response:  subject to the foregoing objections, none.

Request No. 144:
Copies of closing statements for the purchase of, and sale of the real property located at 13, 15, 17 and 19 Bogart Street, Brooklyn, New York by 19 Bogart Realty Development Inc.
Response:  subject to the foregoing objections, none.

Request No. 145:
Documents evidencing any loans made by YOU or Copies of closing statements for the purchase of, and sale of the real property located at 13, 15, 17 and 19 Bogart Street, Brooklyn, New York by 19 Bogart Realty Development Inc.
Response:  subject to the foregoing objections, none.

Request No. 146:
Contract of Sale and Riders thereto by and between Shirokia Development LLC and Wing Fung Chau for the real property located at 142-28 / 142-30 / 142-32 38th Avenue, Flushing, New York.
Response:  subject to the foregoing objections, none.

Request No. 147:
All written communications by and between Shirokia Development LLC and Wing Fung Chau.
Response:  subject to the foregoing objections, none.

Request No. 148:
Copy of any promissory notes signed by YOU payable to 1989 3 Ave LLC.
Response:  subject to the foregoing objections, none.

Request No. 149:
Copy of any promissory notes signed by YOU payable to Columbia Towers.
Response:  subject to the foregoing objections, none.

Request No. 150:
Copy of any promissory notes signed by YOU payable to Jianyuan Yang.
Response:  subject to the foregoing objections, none.

Request No. 151:
Copy of any promissory notes signed by YOU payable to Golden Urban Property
Management LLC.
Response:  subject to the foregoing objections, none.

Request No. 152:
Copy of any checks signed by YOU personally or from an entity in which YOU held
or hold an interest in payable to 1989 3 Ave LLC.
Response:  subject to the foregoing objections, none.

Request No. 153:
Copy of any checks signed by YOU personally or from an entity in which YOU held
or hold an interest in payable to Columbia Towers.
Response:  subject to the foregoing objections, none.

Request No. 154:
Copy of any checks signed by YOU personally or from an entity in which YOU held
or hold an interest in payable to Jianyuan Yang.
Response:  subject to the foregoing objections, none.

Request No. 155:
Copy of any checks signed by YOU personally or from an entity in which YOU held
or hold an interest in payable to Golden Urban Property Management LLC.
Response:  subject to the foregoing objections, none.
Response:  subject to the foregoing objections, none.

Request No. 156:
An itemized list all accountants and bookkeepers who maintained 41-23 Haight Realty
Inc.'s books and records for the period(s) between June 1, 2010, and the present date
including, but not limited to the following: (i) the professional's name and address, and
(ii) the date(s) of service.
Response:  subject to the foregoing objections, none.

Dated:  December 25, 2023


Victor Tsai
Attorney for Defendant
WING FUNG HOME REALTY GROUP INC.
*Office and Post Address:*
3720 Prince Street, 3F
Flushing, NY 11354
(212) 625-9028

To:  Counsels for Plaintiffs

Gary Rosen, Esq.
Rosen Law LLC
216 Lakeville Road
Great Neck, New York 11020
Tel:  (516) 437-3400

## SECOND AMENDMENT TO
## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF 82-25 QUEENS MANSION LLC

**THIS SECOND AMENDMENT TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF 82-25 QUEENS MANSION LLC**(this "**Amendment**") is made effective as of January 15, 2019, by and between Wing Fung Chau("**Chau**"), an individual residing in the State of New York, Bo Jin Zhu("**Zhu**"), an individual residing in the State of New York,  and Season Garden Realty Inc ("**Season**"), a New York corporation, and Dongmei Li("**Li**"), collectively, the "**Members**" and each individually a "**Member**").   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

### RECITALS

WHEREAS, the Members are parties to that certain Amended and Restated Limited Liability Company Agreement of 82-25 Queens Mansion LLC dated as of October 10, 2014, as amended by the First Amendment to Amended and Restated Limited Liability Company Agreement of 82-25 Queens Mansion LLC dated as of January 14, 2019 (collectively, the "**LLC Agreement**");

WHEREAS, the Members have agreed to make certain modifications to the LLC Agreement, and the parties hereto desire to amend the LLC Agreement pursuant to the terms and conditions of this Amendment to effect such modifications to the LLC Agreement; and

NOW, THEREFORE, in consideration of the premises, the mutual promises and covenants contained herein, the parties hereto agree as follows:

### AGREEMENT

1.     <u>Amendments to the LLC Agreement</u>.  The Members hereby agree that the LLC Agreement is amended as follows:

(a) "Members" of Article 2 of the LLC Agreement, Definitions, is hereby amended by deleting said section in its entirety and in lieu thereof inserting the following:

"'Members' means the Persons who have executed a counterpart of this Agreement as Members of the Company and shall include any other Person hereinafter admitted as a member of the Company in accordance with the provisions of Article VIII, for so long as any such Person is a Member under the terms of this Agreement.  The names of the Members of the Company and their Percentage Interests as of the date hereof are set forth on Schedule A-A1 hereto annexed."

(b)  Section 8.1. of the LLC Agreement is hereby amended to the extent that the following subsection is added to the end:

1

"(g). Notwithstanding anything to the contrary in the previous provision or in this LLC Agreement, upon execution of this Amendment, Li shall cease to be a Member with the in-kind distributions having been made to said Member pursuant to the Unanimous Written Consent of the Members dated as of January 14, 2019, and each of Chau, Zhu and Season shall continue as a Member."

2.    Miscellaneous.

(a) This Amendment contains the entire agreement among the parties with respect to the matters contained herein. Except as otherwise expressly provided elsewhere in this Amendment, this Amendment may not be altered, modified or changed except by a written amendment duly executed by all parties hereto at the time of such alteration, modification or change.

(b) In the event any provision of this Amendment is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Amendment shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

(c) The provisions of this Amendment shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

(d) This Amendment may be (i) executed in several counterparts, all of which shall constitute one and the same instrument and (ii) delivered by telecopy, facsimile or in portable document format (PDF) by electronic mail (which shall be deemed an original for all purposes).

(e) This Amendment shall be governed by and construed according to the laws of the State of New York without regard to principles of conflict of law.

(f) Except as modified herein, the LLC Agreement remains in full force and effect.

(g) The parties hereto shall deliver any other documents or instruments as any party hereto may reasonably request to more fully effect and consummate the transactions contemplated hereby.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, this Amendment is executed by the Members, effective as of the date first set forth above.

**MEMBERS:**

_____
Wing Fung Chau

_____
Bo Jin Zhu

Season Garden Realty Inc

By:_____
[Name]:
[Title]:

_____
Dongmei Li
(Outgoing Member)

3

Schedule A-A1

| **Member** | **Address** | **Percentage Interest** |
|---|---|---|
| Wing Fung Chau | 32-37 214 Place, Bayside, NY 11361 | 40% |
| Bo Jin Zhu | 64 Henry Street, New York, NY 10012 | 40% |
| Season Garden Realty Inc | 309 Simpson Place, Peekskill, New York, 10566 | 20% |

## FIRST AMENDMENT TO
## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF 82-25 QUEENS MANSION LLC

**THIS FIRST AMENDMENT TO  AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF 82-25 QUEENS MANSION LLC**(this "**Amendment**") is made effective as of January 14, 2019, by and between Wing Fung Chau("**Chau**"), an individual residing in the State of New York, Bo Jin Zhu("**Zhu**"), an individual residing in the State of New York,  and Season Garden Realty Inc ("**Season**"), a New York corporation, and Dongmei Li("**Li**"), collectively, the "**Members**" and each individually a "**Member**").    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

## RECITALS

WHEREAS, the Members are parties to that certain Amended and Restated Limited Liability Company Agreement of 82-25 Queens Mansion LLC dated as of October 10, 2014 (the "**LLC Agreement**");

WHEREAS, the Members have agreed to make certain modifications to the LLC Agreement, and the parties hereto desire to amend the LLC Agreement pursuant to the terms and conditions of this Amendment to effect such modifications to the LLC Agreement; and

NOW, THEREFORE, in consideration of the premises, the mutual promises and covenants contained herein, the parties hereto agree as follows:

## AGREEMENT

1.      Underline_Amendments to the LLC Agreement_.  The Members hereby agree that the LLC Agreement is amended as follows:

(a) "Members" of Article 2 of the LLC Agreement, Definitions, is hereby amended by deleting said section in its entirety and in lieu thereof inserting the following:

"Members" means the Persons who have executed a counterpart of this Agreement as Members of the Company and shall include any other Person hereinafter admitted as a member of the Company in accordance with the provisions of Article VIII, for so long as any such Person is a Member under the terms of this Agreement.  The names of the Members of the Company and their Percentage Interests as of the date hereof are set forth on Schedule A-A1 hereto annexed."

(b)  Section 8.1. of the LLC Agreement is hereby amended to the extent that the following are added to the end:

"(e). New Members may be admitted to the Company by unanimous written consent of the Members.

(f) Upon execution of this Amendment, Li shall be admitted to the Company as a Member, and each of Chau, Zhu and Season shall continue as a Member."

2.   <u>Miscellaneous</u>.

(a) This Amendment contains the entire agreement among the parties with respect to the matters contained herein. Except as otherwise expressly provided elsewhere in this Amendment, this Amendment may not be altered, modified or changed except by a written amendment duly executed by all parties hereto at the time of such alteration, modification or change.

(b) In the event any provision of this Amendment is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Amendment shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

(c) The provisions of this Amendment shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

(d) This Amendment may be (i) executed in several counterparts, all of which shall constitute one and the same instrument and (ii) delivered by telecopy, facsimile or in portable document format (PDF) by electronic mail (which shall be deemed an original for all purposes).

(e) This Amendment shall be governed by and construed according to the laws of the State of New York without regard to principles of conflict of law.

(f) Except as modified herein, the LLC Agreement remains in full force and effect.

(g) The parties hereto shall deliver any other documents or instruments as any party hereto may reasonably request to more fully effect and consummate the transactions contemplated hereby.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, this Amendment is executed by the Members, effective as of the date first set forth above.

**MEMBERS:**

_____
Wing Fung Chau

_____
Bo Jin Zhu

Season Garden Realty Inc

By: _____
[Name]:
[Title]:

_____
Dongmei Li

3

Schedule A-A1

| **Member** | **Address** | **Percentage Interest** |
|---|---|---|
| Wing Fung Chau | 32-37 214 Place, Bayside, NY 11361 | 21.2660% |
| Bo Jin Zhu | 64 Henry Street, New York, NY 10012 | 21.2660% |
| Season Garden Realty Inc | 309 Simpson Place, Peekskill, New York, 10566 | 10.6330% |
| Dongmei Li | 9-31 121st Street, College Point, NY11356 | 46.8350% |

82-25 QUEENS MANSION LLC
UNANIMOUS WRITTEN CONSENT
OF THE MEMBERS
Date: January 15, 2019

THE UNDERSIGNED, being all of the Members of 82-25 Queens Mansion LLC, a New York limited liability company, having its principal office at 86-22 Broadway, 2nd Floor, Elmhurst, NY11373 (the "**Company**"), acting without a meeting pursuant to Section 407 of the New York Limited Liability Company Law, hereby unanimously consent to and agree to the adoption of the following resolutions:

RESOLVED that the Company shall make in-kind distributions to certain Members of a number of condominium units that Company is currently holding in the condominium known as Queens Mansion Condominium located at 82-25 Queens Boulevard, Elmhurst, NY 11373, Block 1542, Lots 1101, 1102 and 1103(Base Lot 40), Borough of Queens, City and State of New York, together with all the improvements or buildings thereon in accordance with Exhibit A hereto annexed; and it is further

RESOLVED that Managing Member Wing Fung Chau is hereby authorized and empowered by the Members to: (i) negotiate, prepare, execute and deliver, in the name and on behalf of the Company, each of the distribution and conveyance documents, and any other agreements, documents and instruments, as may be required in connection with the distributions and conveyances, with such changes, modifications or amendments as the Managing Member, in his or her sole discretion, may approve, the Managing Member's execution and delivery thereof to be conclusive evidence of such approval; and (ii) cause the Company to perform the obligations and carry out the duties of the Company thereunder; and it is further

RESOLVED, that Managing Member be, and hereby is, authorized, empowered and directed to take from time to time, in the name and on behalf of the Company, all such action and to execute, deliver and file any and all such certificates, instruments, agreements and other documents, as he or she considers necessary, appropriate or convenient to carry into effect the purposes and intent of any and all of the foregoing resolutions; and it is further

RESOLVED, that any acts of the Managing Member and of any person or persons designated and authorized to act by the Managing Member, which acts would have been authorized by the foregoing resolutions except that such acts were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, approved and adopted as acts in the name and on behalf of the Company; and it is further

RESOLVED, that any person dealing with the Managing Member authorized by the foregoing resolutions, in connection with any of the foregoing matters shall be conclusively entitled to rely upon the authority of the Managing Member and by his or her execution of any document, agreement or instrument, the same being a valid and binding obligation of the Company enforceable in accordance with its terms; and it is further

RESOLVED, that the undersigned hereby waive any and all irregularities of notice, with respect to the time and place of meeting, and consents to the transaction of all business represented by this Unanimous Written Consent; and it is further

RESOLVED, that a facsimile, telecopy or any other reproduction of this Unanimous Written Consent may be executed by the undersigned, and an executed copy of this Unanimous Written Consent may be delivered by the undersigned by facsimile transmission, electronic mail in Portable Document Format (PDF), or other similar instantaneous electronic transmission device or format pursuant to which the signature of or on behalf of the undersigned can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes; and it is further

RESOLVED, that this Unanimous Written Consent may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, and all such counterparts together shall constitute but one consent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this instrument effective as of the date first written above.

**MEMBERS:**

_____
Wing Fung Chau

_____
Bo Jin Zhu

Season Garden Realty Inc

By:_____
[Name]:
[Title]:

_____
Dongmei Li

3

**EXHIBIT A**

| Member | Units Distributed | Percentage of Common Interest In Condominium |
|---|---|---|
| Wing Fung Chau<br>Bo Jin Zhu<br>Season Garden Realty Inc | 1A&1B | 16.1357% |
| Dongmei Li | 1C | 14.2145% |

# LAWRENCE LIXIN YANG, P.C.
## 楊　立　信　律　師　事　務　所

135-11 Northern Boulevard, 2nd Floor
Flushing, New York 11354-4006
Tel.:(718) 886-7999
Fax.:(718) 886-7996

March 4, 2019

Via email:　　Nzhanglawfirm@gmail.com
　　　　　　Kzhanglawfirm@gmail.com

The Zhang Law Firm, P.C.
Attn: Nan (James) Zhang, Esq.
136-82 39th Avenue, Suite 3A
Flushing, NY 11354
Tel.: (347) 233-9912
Fax.: (347) 710-1100

**Re**:　**64-03 Realty LLC to Chau**
　　　**Premises: 64-05 Woodside Avenue, Unit No. 2D, Woodside, NY 11377**

Dear Mr. Zhang/Kaili,

Please have your client prepare the following payments at closing:

1.　Proportionate share for 421-a Partial Tax Exemption Program of **$1,300.32** ($47,908.00 × 2.7142%):

　　**a.** **$350.00** payable to **Law Office of Yinghui He, P.C.** in check or money order;

　　**b.** **$950.32** payable to **64-03 Realty LLC** in *certified or official bank check*; (to be combined with 5.)

2.　Sponsor's Attorney Fee:

　　**$1,500.00** payable to **Lawrence Lixin Yang, P.C.** in *certified or official bank checks*;

3.　Contribution to the Working Capital:

　　**$226.24** (Estimated one month's common charges) payable to **Wing Fung Plaza Condominium Inc.** in check or money order;

4.    First monthly Common Charges:

**$226.24** (One month's common charges of 1A) payable to **Wing Fung Plaza Condominium Inc.** in check or money order;

5.    Of **$252,000.00**, the Balance of Purchase Price ($280,000.00 − $28,000.00):

**$252,000.00** payable to **64-03 Realty LLC** in ***certified or official bank checks***;

6.    Adjustments for real estate taxes:

**$143.11** ($477.04÷90×27) payable to **64-03 Realty LLC** in check or money order; and

7.    Adjustments for common charges:

**$197.05** ($226.24÷31×27) payable to **64-03 Realty LLC** in check or money order.

Very truly yours,

*Lawrence Yang*

Lawrence Yang, Esq.

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004006

Wendy Chan
665934238

DATE 3/5/19          01-292/260

PAY TO THE ORDER OF Wing Fung plaza Condominium Inc.          $ 226.27

two hundred and twenty six dollar          DOLLARS

FOR works Capital - 640520

---

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004007

Wendy Chan
665934238

DATE 3/5/18          01-292/260

PAY TO THE ORDER OF Law Office of Yinshui He, P.C.          $ 350.00

three hundred and fifty dollar          DOLLARS

FOR 421-Partial Tax Exemption Mshn

---

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004008

Wendy Chan
665934238

DATE 3/5/19          01-292/260

PAY TO THE ORDER OF Lawrence Lixin Yang, P.C.          $ 1,500.00

Fifteen hundred dollar          DOLLARS

FOR Sponsor Attor Fee

**37-10 114 LORD REALTY LLC**

1-292/260

1024

DATE 3/5/19  PMP

PAY TO THE
ORDER OF 64-03 Realty LLC                    | $ 252,950. 37/xx

two hundred fifty two thousand nine hundred fifty dollars 37/xx    DOLLARS   ← Heat Reactive Ink

**CATHAY BANK** Member of F.D.I.C.

36-54 MAIN STREET
FLUSHING, NEW YORK 11354

MEMO 64-05 Woodside, VN-2D.

MP

Wendy Chau
865334238

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004003

DATE 3/5/19                    01-292/260

PAY TO THE ORDER OF  64-03 Realty LLC                                    $ 197.05/100

one hundred and ninety seven dollars                          05/100   DOLLARS

FOR  Water Common Chgs 64-05/20

---

Wendy Chau
865334238

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004004

DATE 3/5/19                    01-292/260

PAY TO THE ORDER OF  64-03 Realty LLC                                    $ 143.11/100

one hundred and Forty three dollars                          11/100   DOLLARS

FOR  Water Per Tax 64-05/20

---

Wendy Chau
865334238

**Cathay Bank**
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004005

DATE 3/5/19                    01-292/260

PAY TO THE ORDER OF  Wing Fung Plaza Condominium Inc.                    $ 226.24/100

two hundred and twenty six dollars                          24/100   DOLLARS

FOR  Common charges 64-05/20

Wendy Chau

Cathay Bank
36-54 MAIN STREET
FLUSHING, NY 11354
1-800-922-8429

166004002

01-292/260

DATE 3/5/19

PAY TO THE ORDER OF THE ZHANG Law Firm, P.C.     $ 1,000. 00

One Thousand dollar                              DOLLARS

FOR Better Legal Firm

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:   **Li to Chen – Letter of Indemnification**
      **Premises: 82-25 Queens Boulevard, Unit PS5&PS8, Elmhurst, NY 11373**

The Board of Queens Mansion Condominium hereby undertakes to indemnify the Purchaser of the above-captioned premises against any and all liabilities due to violations, governmental or municipal, prior to closing of the transaction.

If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
      Wing Fung Chau, President

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:   **Li to Chen – Common Charges**
      **Premises: 82-25 Queens Boulevard, Unit PS5&PS8, Elmhurst, NY 11373**

      Please be advised that, after examination of our records, we found that there are no unpaid common charges and/or assessment accrued against the above-referenced condominium unit as of date.

      If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
    Wing Fung Chau, President

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:     **Li to Chen – Right of First Refusal**
        **Premises: 82-25 Queens Boulevard, Unit PS5&PS8, Elmhurst, NY 11373**

Please be advised that, after due consideration, the Board of Managers hereby waives its right of first refusal to purchase the above-captioned Condominium Unit.

If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
     Wing Fung Chau, President

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:     **<u>Li to Chen – Letter of Indemnification</u>**
        **<u>Premises: 82-25 Queens Boulevard, Unit PS4&PS9, Elmhurst, NY 11373</u>**

The Board of Queens Mansion Condominium hereby undertakes to indemnify the Purchaser of the above-captioned premises against any and all liabilities due to violations, governmental or municipal, prior to closing of the transaction.

If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
      Wing Fung Chau, President

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:     **Li to Chen – Common Charges**
        **Premises: 82-25 Queens Boulevard, Unit PS4&PS9, Elmhurst, NY 11373**

      Please be advised that, after examination of our records, we found that there are no unpaid common charges and/or assessment accrued against the above-referenced condominium unit as of date.

      If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
    Wing Fung Chau, President

# QUEENS MANSION CONDOMINIUM

86-22 Broadway, 2nd Floor
Elmhurst, NY 11373
Tel.: (718) 699-9000

June 3, 2019

To Whom It May Concern:

Re:     **Li to Chen – Right of First Refusal**
        **Premises: 82-25 Queens Boulevard, Unit PS4&PS9, Elmhurst, NY 11373**

       Please be advised that, after due consideration, the Board of Managers hereby waives its right of first refusal to purchase the above-captioned Condominium Unit.

       If there is any further question, please feel free to contact the Board.

Sincerely,

Board of Managers

By: _____
    Wing Fung Chau, President

86 CANAL CONDOMINIUM

SMOKING POLICY

Dated: October 10, 2018

In order to best possibly decrease the risk of fire of the Condominium, prevent the known health hazards of secondhand tobacco smoke to Unit Owners and other occupants, and maintain a healthy air environment in the Condominium, the Board of Managers hereby adopts this smoking policy(the "Smoking Policy").

1.      Definitions

(a)      "Electronic Cigarette" means an electronic device that delivers vapor for inhalation. Electronic cigarette shall include any refill, cartridge, and any other component of an electronic cigarette. Electronic cigarette shall not include any product approved by the food and drug administration for sale as a drug or medical device.

(b)      "Smoking" means inhaling, exhaling, burning or carrying any lighted or heated cigar, cigarette, little cigar, pipe, water pipe, herbal cigarette, non-tobacco smoking product, or any similar form of lighted object or device designed for human use or consumption  by  the inhalation of smoke.

(c)      "Tenant" means a tenant of a Condominium Unit Owner, subtenant, lessee, sublessee or other individual(s) or entity entitled to the possession or to the use or occupancy of a Condominium Unit.

(d)      "Unit Owner" means the individual(s) or entity owning a Condominium Unit in the Condominium.

2.      Scope of Prohibition

Smoking and/or using an electronic cigarette are prohibited at any time during the daytime and/or nighttime in the following areas of the Condominium:

(a)      All indoor common areas, including, without limitation, hallway, lobby, corridors, stairs, and any other area to which that Unit Owners and/or Tenants may have access.

(b)      All indoor areas within a Unit, including, without limitation, the living room, bedroom, kitchen, bathroom, closet, and any other area to which that the owner of the Unit and/or its Tenant may have access.

(c)      All outdoor areas, including, without limitation, common courtyards, rooftops, balconies, terraces, and patios, within fifteen(15) feet of the entrance and/or exit

1

of, walk or path from and/or to, the Condominium, and any other outdoor area of the Condominium to which that Unit Owners and/or Tenants may have access.

3.      Penalties For Violations

(a)      Every person who violates Subsections (a), (b) or (c) of Section 2 shall, for a first violation thereof, pay a fine of One Hundred Dollars($100); for a second violation, and any subsequent violation, all of which are committed within a period of twelve(12) months, pay a fine of Two Hundred Dollars($200).

(b)      Failure of any person to pay penalties as provided in this Section(a) shall result in the penalties becoming an assessment as part of the common charges to the Unit(s) related to the violation and a lien thereto.

4.      Scope of Application

This Smoking Policy shall apply to all Unit Owners, Tenants, the invitees as well as any other person on the premises.

5.      Enforcement

(a)      The Board of Managers shall the power to enforce the provisions of this Smoking Policy and collect the penalties for the benefits of the Condominium.

(b)      Any Unit Owner, Tenant, invitee and other persons on the premises may report to, file a complaint with the Board of Managers, or report the incident to the City of New York.

6.      Effective Date

This Smoking Policy is effective immediately.


Board of Managers
of
86 Canal Condominium


2

January  18th, 2015

**DESCRIPTION OF THE PROPERTY (THE REPORT)**
**88 CANAL TOWER**
**86 CANAL STREET**
**NEW YORK, NY 10001**

**Report prepared by**          **CHANG HWA TAN, RA**
**TAN ARCHITECT P.C.**
**194-02 NORTHERN BLVD.**
**SUITE# 205, FLUSHING**
**NEW YORK 11358**

**IN ACCORDANCE WITH PLANS AND SPECIFICATIONS**
**AND OTHER INFORMATION SUPPLIED BY THE SPONSOR**
**AND HIS CONSULTANTS.**

**Architectural report for the structure to be known as THE CANAL TOWER CONDOMINIUM located at 86 Canal Street in Borough of Manhattan and State Of New York. The plans have been filed and approved by the Department of Buildings under the application number 104844144.**

This property and its proposed use will comply with all zoning and use requirements and the Certificate of Occupancy will be presented at closing.

A. <u>Location and Use of Property</u>:

The condominium is located in block # 292 lots #16.
The address of the property is 86 Canal Street, New York, NY 10002 in Borough of Manhattan County.
Zoning District C6-1G (R7 Equivalent), Map 12d of the New York City Zoning Resolution dated 1961 as amended on May 2001. The New York City Zoning Resolution, as per section 22-12 permits Use Group 2 and 3, Residential Uses as-of-right.

B. <u>Status of Construction</u>:

The building is under construction with the approved plans dated 01/26/2011. This project is designed within the requirements of all applicable federal, state and local codes and regulations governing accessibility to the disabled including the ADA standard and Local Law 58/87.

The building under construction will comply with section BC 601 of the Building Code of the City of New York for Type 1B construction. The exterior walls, exit ways, shafts, structural members, floors and roofs are constructed of noncombustible materials having assemblies as specified on Table 601 of Building Code.
The new building consists of fourteen (32) Residential units from 5th floor to 12th floor, (6) Retail Stores situated on first floor, and (2) Retail Stores in the cellar. For 2nd, 3rd and 4th floor, there consist of 17 bedrooms hotel per floor. The Sponsor will obtain a temporary Certificate of Occupancy prior to closing if needed.

The completion date of the project is projected to be December 31st, 2015 and it is anticipated that the Final Certificate of Occupancy will be issued on June 1st, 2016. "Investors are advised to visit the DOB Website/Consumers Tips for its recommendations when purchasing units in a condominium that does not have a Final Certificate of Occupancy."

C. <u>The Site</u>:

The land is located on the South side of Canal Street and West side of Eldridge Street, a corner lot, distance 0.00' Southwest of the corner formed by the intersection of Canal Street and Eldridge Street.

There is one twelve-story building proposed on the site. The building is for mixed use, with retail stores on the first and cellar floor. Hotel on 2nd, 3rd and 4th floor. Residential from 5th to 12th floor.
The land and premises:
Begin at the point 0.00' Southwest of the corner formed by the intersection of Canal Street and Eldridge Street, and runs South 52'-6 ¾".
Thence in West 47'-11".
Thence in South 3'-0 ¾"
Thence in West 13'-6 ¾"
Thence in North 2'-7 ¼"
Thence in West 16'-2"
Thence in South 21'-10"
Thence in West 47'-10 ½"
Thence in North 75'-0"

Thence in East 125'- 4 ½" to the point of beginning

The lot area is 7,718.6 square feet as per survey of Precision Surveys, Professional Land Surveyors.

**D.** **Street**

The Street, Canal and Eldridge Street fronting the lot owned and maintained by the City of New York. Canal Street is 75' wide and it is a two way traffic street. Eldridge Street is 50' wide and it is a one one way traffic street.The roadway pavements are composed of asphalt and in fair condition. The sidewalk and curb fronting the property will be new poured concrete, free of tripping hazard as directed by Department of Transportation of City of New York under current approved paving plan. The sidewalks curb cuts, ramps/aprons shall be comply with NYC DOT's/ Local Law and ADA requirements.

The sidewalk slopes away from the building providing positive storm drainage and ponding to the roadway and to the cast iron grating concrete catch basins located near the intersection of Canal Street. and Eldridge Street. "The condominium association will be responsible for maintaining the sidewalk in accordance with the requirements of the NYC Department of Transportation."

There are utility poles with street lighting on Canal Street and Eldridge Street (located at the corner of Canal Street and Eldridge Street on the opposite side of Eldridge Street sidewalk) provides sufficient illumination to public safety. The street light is of low pressure sodium type. In addition to the lighting provided by the City, there will be outdoor lighting fixtures installed on the building to illuminate the entrances and sidewalk.

There is one existing fire hydrant on North side of Canal Street sidewalk approximately 60'-0" from the building, and one on south side of Canal Street sidewalk approximately 50'-0" from the building. There is one existing fire hydrant on the East side of Eldridge Street sidewalk approximately 37'-0" from the building.

**E.** **Utilities:**

Water: Water is furnished by the City of New York Water Distribution System and is obligated to the condominium owners in common. One common water meter is provided for the building. The Sponsor reserves the right to install sub-metered and the condominium board will bill each unit accordingly.

Sewer: The entire sanitary waste will be discharged from the building to an existing 4'-0"x2'-8" combined sewer system in Canal Street, currently maintained by New York City Department of Environmental Protection. The entire storm water drainage will be controlled flow by means of roof detention and control flow devices and discharged from the building to the existing 4'-0"x2'-8" combined sewer system in Canal Street.

Gas: Natural gas service will be provided by Keyspan Energy Delivery Company. Natural gas service is metered to each unit for cooking purposes, domestic hot water and heating. There are 41 gas meters total for the building. All gas meters are located in the cellar meter room. The gas piping is to be threaded black iron.

Electricity: Electric service is provided by the Consolidated Edison Company of New York and is individually metered to each condominium unit. A separate electric meter is provided for common spaces.

Telephone: Verizon Company will provide telephone service on an individual basis to each condominium unit.

**F.** **Sub-soil Conditions:**

Sub-soil bearing capacity has been tested and reported by Pillori Associates P.A. The foundation walls and spread footings of the proposed building have been designed based on the bearing strata reported. There was no ground water encountered at thirty-two feet below ground surface. There is no evidence

of ground water infiltration through the foundation walls and little, if any, indicates no visible streams or natural watercourses in the property. There is no apparent danger of flooding due to the water table or from any other bodies of water. The ground surface of the site is stable and no sub-grade drainage system is provided for the foundation of the building. There is 1" rigid insulation board provided to negate the ad-freezing stresses to the foundation walls. This property is located in FEMA zone "C"; areas outside the 1-percent annual change of flood.

**G.**   <u>**Landscaping and Enclosures:**</u>

The sponsor will not provide any landscaping or recreational equipment. Sidewalks will be 5" thick newly paved concrete located in the front and side of the building. There are no new trees to be planted along the Canal Street and Elderidge Street sidewalks.

**H.**   <u>**Building size and height:**</u>

The building is somewhat L- shape with no setback. The size of the building is approximately 125'-4" wide along Canal Street and approximately 52'-6" wide along Eldridge Street. The west side of the building which is parallel to Eldridge Street is  75'-0". The total building height measured from the base plane to the main roof is approximately 126'-10". There will be twelve stories and a cellar in the building. The elevator equipment room is located on the roof level. The masonry parapet wall height is 3'-6" high above finished roof. As a Special Risk that Local Law 11/98 applies to this building. The administrative code of the City of New York, in relation to inspection of the exterior walls of buildings greater than six stories in height; in order to maintain a building's exterior walls and appurtenances thereof in a safe condition shall be conducted at least once every five years.

The following are floor to ceiling heights:

| | |
|---|---|
| Cellar | 8'-0" |
| First Floor | 11'-0" |
| Second Floor | 9'-0" |
| Third Floor | 9'-0" |
| Fourth Floor | 9'-0" |
| Fifth Floor | 8'-0" |
| Sixth Floor | 8'-0" |
| Seventh Floor | 8'-0" |
| Eight Floor | 8'-0" |
| Ninth Floor | 8'-0" |
| Tenth Floor | 8'-0" |
| Eleventh Floor | 8'-0" |
| Twelfth Floor | 8'-0" |

**I.**   <u>**Construction Systems:**</u>

(1) Structure of the Building:

The structural system for the building is classified mainly as non-combustible construction. This type of structure has exterior load bearing walls of non-combustible materials. Floors and roofs are constructed of non-combustible materials and assemblies as specified by the New York City Department of buildings requirements.

The foundation consists of 30" thick poured in place reinforced normal weight stone concrete continuous footings or concentrated footings; and 12-inches thick and 16 inches thick poured in place reinforced concrete foundation walls with #5 & #6 size steel re-bars. The waterproofing material for foundation walls is trowel on mastic high-strength elastomeric liquid rubber and acrylic with 1" rigid insulation protection board. There will be mastic water-stops self-sealing moisture barrier at any concrete joint and concrete slab to keep the moisture out. The 10mil vapor barrier will be provided under the concrete slab on grade. The interior bearing walls consist of minimum of 8-inch concrete masonry unit.

(2) Exterior of Building:

    a.  Walls: Both bearing and non-bearing exterior walls are constructed as follows: 4" face brick, 8" concrete masonry unit (CMU), 2-1/2" metal studs, insulation and 5/8" gypsum board; which is 2 hour-rating wall. All exterior walls shall be insulated with Kraft paper backed fiberglass batt insulation having a minimum 'R' value of 13. The 2 ½" metal studs to be installed approximately ¾" away from the masonry wall to provide clearance for uneven inside surface of masonry walls, and to provide adequate space for 3 1/2" batt insulation. There is 1" air space provided in the masonry wall that will allow any water penetration into the wall to be drained out with the through the wall fabric flashing and weep holes at 24 inches on center of the brick joints. Periodic inspections and reports as per Local Law 11/98 will be required. The next relevant façade inspection cycle for this building will on February 21, 2020. The condominium association will be responsible for filing the LL11/98 requirement during the relevant façade inspection cycle.

    b.  The floor construction consists of structural steel framing with 4" thick light weight concrete over 20 gauge thick metal decking, supported by the bearing walls and steel columns. The finish floor will be ¾" thick oak wood with ¾" plywood sleepers. The floor assembly to receive a STC rating of 50.

    c.  Roof: The roof will be insulated with rigid insulation having an average "R" factor of 38 is compliant with New York State Energy Conservation Code. The roof over the sixth floor is flat and composed of 4" poured concrete over metal decking, with tile finish on cement base over waterproofing membrane pitched to drains, use as a terrace for the condominium units. Roof over the seventh floor is flat and composed of 4" poured concrete over metal decking, roofed with modified bitumen roof by Firestone Inc. The sponsor warrants the roofing surface for one year.

    d.  Windows and Balcony Doors: All windows will be sliding double insulated low-E glass in white aluminum frame with vinyl insects' screens. The balcony doors will be swing type double insulated glass in metal-cladded wooden frame. The windows and doors will be caulked from the exterior weather with GE silicon caulking with backer rods. The air infiltration level will be kept to the minimum. The ability to stand the cold weather will be adequate in terms of ambient in the Borough of Queens, per minimum requirements of the New York State Energy Conservation Code. The windows and balcony sliding doors is manufactured by Apollo Window System. The window and door sills are 4" thick precast concrete slab and the lintels are of three 4" steel angles up to four feet wide openings. Any window opening wider than four feet will receive a W8 steel beam lintel with 4" angle seats. A one year manufactures warranty is provided by the manufacturer of windows. There will be no lot line window in this project.
The steel windows lintels shall be finished with enamel paint. All steel windows lintels shall be scraped and painted with 1) Zinc chromate primer; 2) 1 coat enamel undercoat; & 3) I coat exterior alkyd enamel paint.

    *This building has no Landmark Status.

    *As a Special Risk, the purchasers of condominium are obligated to install child safety window guards which are made of aluminum.

    e.  Test results of window and door air infiltration:

| Paragraph No. | Title of Test | Measured | Allowed |
|---|---|---|---|
| | Air infiltration | | |
| | 0.56 PSF (15 mph) | 0.10 CFM/FT | ----------- |
| | 1.57 PSF (25 mph) | 0.22 CFM/FT | 0.37 CFM/FT |

Note on Air infiltration: With the window and door sash and ventilators closed and locked, test unit in accordance with ASTM E-283 at static air pressure difference of 1.57 psf

f.   Test results of water resistance:

| Paragraph No. | Title of Test | Measured | Allowed |
|---|---|---|---|
| | Water Resistance 5.0 GPH/SF WTP=3.0 PSF | No Entry | No Entry |

Note on Water Resistance:

1.  With the window and door sash and ventilators closed and locked, test unit in accordance with ASTM E-331 at static air pressure difference of 10 psf.

2.  There shall be no water leakage as defined in ASTM E-331 at this specified static air pressure difference to meet the performance requirement

3.  Test shall be completed with and without exterior applied screens.

Condensation Resistance Factor (CRF) (moisture seepage)

1.  With window and door sash and ventilators closed and locked, test unit in accordance with AAMA 1502.7 using test size of 4'0" by 6'0" and framing configurations specified in the AAMA specification standards.

2.  Condensation Resistance Factor (CRF) shall not be less than 50.

(3) Parapets and Copings:

The parapet walls are partly brick and block, section of metal guard railing in front and rear of building. The parapet wall is 3 feet 6 inches high above the finish roof or finish floor. The coping is a 4" thick pre-cast concrete.

(4) Chimney and Caps:

There are three 12" diameter low temperature chimney for multiples heating boilers; made of 20 gauge metal-bestos double walls lined stainless steel; manufactured by "Selkirk"; enclosed with 2-hour rated drywall construction above the boiler rooms in 5[th], 6[th] floor and roof. There will be a steel anti-down draft cap with bird screen installed at the top of the chimney where it is located 3'-0" above the highest point of the structure per building code compliant.

(5) Balconies and Terraces:

There will be balconies for residential units on the fifth, sixth, seventh, eighth, ninth, tenth and eleventh floors of the building. The balconies will be constructed of steel beam framing with 4" thick concrete slab over metal decking. There will be 42" high steel railing; rectangular tube rails supported by row of 3/4" square vertical steel balustrades at 4 1/2" on center spacing maximum (welded to the horizontal rails). The iron railing will be painted with enamel corrosive resistant paint. The iron railing has welded connection, with no fastener and has no horizontal railing which is child-proof. There are roof terraces located on the fifth floor of the building. The terraces will be part of the outdoor recreation area. The balconies and terraces floor will be finished with anti-slip tiles. The balconies floor slopes away from the building providing positive storm drainage and a perimeter edge drip groove is to be provided. The soffit under the balconies will be of ventilated vinyl ceiling. The terraces floor slopes to an anti-trip floor drain and pipe to a storm drainage system on site. The parapet coping of the terraces is of the 4" thick precast concrete slab.

(6) Exterior Entrances:

The main entrance doors will be of clear anodized aluminum frame with 1" thermal barrier glass and thermal break together with integral weather stripping. The inner vestibule doors are to be the same type as the front entrance doors and to be fitted with an entry cylinder lock with electric door release. The framing for both entrance and vestibule doors will be of clear anodized aluminum medium stile. The entrance doors are to comply with zoning resolutions and New York State Energy Code. The doors from the rear egress exit of the building is of metal type with no lock set from interior side of the door. For adequacy of exterior lighting see paragraph 'D' for details. The exterior entrance floor slopes away from the building to two flush storm drains located in the front yard area. The floor is of new poured concrete slab paved with granite tiles; free of tripping hazards; and is ADA compliant where the NYC local Law 58 required the entrances to be accessible with the handicapped ramp. There are metal guard railing and handrails in the entrance area of steps and handicapped accessible ramp.

(7) Roof, Roof terraces and Roof structures:

The main roof of the building is flat. The flat roof is constructed of steel beam with 4" poured concrete over metal decking with an average of 6" thick R-38 rigid insulation, a base sheet and roofing material APP-160. The roof surface will be finished with silver color roofing paint. The product is manufactured by Firestone. The Firestone item number is ASTM D 6222-98. All roof penetrations (e.g. vent stacks, vents, structural framing for ducts and fans) will be flashed with aluminum cap and base flashing where necessary. All the roofs are pitched to permit storm water to flow towards the roof drains. Storm water will drain without ponding. There are three 3" cast iron area drain with nickel brass adjustable flush type strainers for tripping hazard on seventh floor roof terraces. The main roof will receive two 3" cast iron roof drains with dome type strainers. The bulkhead roofs will pitch to edges where storm water drains to aluminum gutters and leaders flow to the roof below.
Firestone will provide 10 year manufacturer warranty to the roof. "Regarding the Roof - As the Special Risks please be advice, the sponsor is not providing NDL Manufacturer's warranty for the new roof. The absence of the NDL manufacturer's warranty may indicate that the roof membrane and appurtenances were not inspected for compliance with the manufacturer's specifications for installation. As such, premature deterioration & replacement of the roof membrane may be anticipated and therefore should be budgeted for"

The sponsor warrants the roofing surface for one year with respect to defects and failure of the roof surfacing performed in a skillful manner. The warranty period with respect to material defects in the structural components of the roof shall be 6 years. The warrantee period shall begin on the date of conveyance of title to the first unit.

Nothing may be built on said areas without a permit from the Department of Buildings and/or a variance from the Board of Standards and Appeals. In the event a permit and/or variance is obtained and construction is done, the Board of Managers will have access for inspection and repair and the Board of Managers may regulate any one or more of the following aspects of the construction;
1.  Time periods during which work is permitted;
2.  The manner in which construction debris will be handled;
3.  Measures that must be taken to prevent compromising the security of the building during construction;
4.  The interruption of services during construction;
5.  Liability insurance for contractor during construction.

(8) Metalwork at roof level

There are no exterior metal stairs, vertical ladders, hatches and gooseneck on the roof for this project. There will be galvanized sheet metal rain caps with bird screens for all bathroom exhaust ducts. There is no rooftop mechanical equipment, dunnage beam and pavers on the roof of this building.
All exterior metals, including fasteners if any shall be corrosion resistant.
There is no fire escape in this project.

(9) Bulkheads:

There is a stair bulkhead required for the building where the roof pitched less than 20 degrees as per New York City building code. The stair, elevator and machine room bulkheads are made of rated masonry wall enclosures. The sub-structure of bulkhead roofs consists of 4" concrete slab and R-38 rigid insulation with modified bitumen roof.

(10) Skylights:

Skylight over common stair is of 20 square-feet galvanized steel type with plain glass and fixed vent with wire screen over and under.

(11) Yards and Courts:

There is no rear yard area since the building occupied the whole lot.

(12) Interior Partitions:

The partition walls between condo units and common public halls, stair and duct spaces shall be constructed with metal studs covered with two layers of 5/8" type 'X' fire coded gypsum board on both sides. The partition walls are 2-hour fire rating and have a STC rating of 50. All other interior partition walls within the condo units shall be constructed with metal studs covered with one layer of 5/8" gypsum board on both sides. The demising partition walls in cellar between elevator lobby, and stair shall be constructed with metal studs covered with two layers of 5/8" type 'X' fire coded gypsum board on both sides. The partition walls are 2-hour fire rating and have a STC rating of 50.

(13) Interior Stair:

The common interior egress stairs are to be concrete filled metal pan construction with 1" nosing. Handrails for stair to be 2'-10" high constructed of metal tubing. The interior stair wall shall be constructed with metal studs covered with two layers of 5/8" type 'X' fire coded gypsum board on both sides, with sound attenuation blanket, having a rating of two hours. The wall between the 'scissor stairs' will be constructed of two hour rating gypsum board partition constructed of metal studs with two layers of 5/8" type 'X' fire coded gypsum board on both sides. The wall of egress stair from cellar to first floor is constructed of two hour rating gypsum board partition of metal studs with two layers of 5/8" type 'X' fire coded gypsum board on both sides.

(14) Doors and Frames:

All interior doors to the common stair hallways, apartment entrances, refuse chute rooms, boiler room, meters rooms, elevator machines control room, storage room and janitor closet are to be fireproof steel doors having a minimum fire rating of one and one-half hour, and with self closing devices. All frames are to be of 16 gauge steel. All other interior room doors are to be swing type with two-panel solid core wood. The frames are to be made of wood. All the closet doors are to be of swinging type or sliding type; two-panel solid core wood type. All exterior doors shall receive Commercial-Grade I hardware by 'Marks USA' or equal. The finish of hardware shall be satin chrome. The interior door hardware will be Grade II by 'Marks USA' or equal. The finish of hardware shall be brush stainless steel.

(15) Elevator and machine room:

There are two passenger elevator provided in the building. The elevator for hotel has five stops from cellar, first to fourth floor level. The elevator for residential has ten stops from cellar, first, fifth to twelfth floor.The elevator machine is located above elevator shaft over the roof.
Manufacturer – Hollister Whitney (AC Elevator Inc.)
Capacity – 2500 lbs at speed of approximately 300 feet per minute.
Type of Machine – Traction
Motor – AC motor-generator Set Manufacturers

Location – Center of building
Finishes of Cab –wall - Laminate plastic attached to steel plate shaft
--floor - Porcelain tile
--ceiling - Aluminum frame with opal white panels
--lighting – Fluorescent lighting installed above ceiling panels
Control – Microprocessor
Type of doors – Single Slide steel door
Number of Stops: Residential – (10) ten
Number of Stops: Commercial – (5) five
Number of passenger - (12) twelve persons
Smoke detector installed in the elevator shaft area shall detect fire hazard condition.
In the case of fire, the said detector, through the control circuitry and relays, shall cause the elevator cabin to return to the ground floor.

(16) Mailboxes:

U.S. postal service approved type mailboxes will be provided for each unit, in entry vestibule at first floor level. The Mailboxes is manufactured by Auth Florence model# 1250-6HA. The mail boxes are made of heavy gauge aluminum with natural aluminum satin finish.

(17) Exterior metal railings:

All Exterior Railings are stainless steel railings.

J.    **Auxiliary Facilities:**

**Refuse Disposal Room:** The building will have a compactor room in the cellar with a compactor machine installed per code. Floors fifth through twelfth will have an intake door and chute for unit owners to discard their refuse directly into the compactor. The compacted refuse will be deposited at the proper location and on scheduled days for pick up by the New York City Department of Sanitation. The trash compactor is manufactured by Chutes Enterprises Inc. model# Chief TCU2  with a capacity of 35,000lbs/8,000 cu-ft per day. The Compactor machine is hydraulic type. The compactor is subjected to change.
.

K.    **Plumbing and Drainage:**

(1) Water Supply:

Domestic water is supplied by 4" ductils iron service pipe from a 12" city water main in Canal Street. Water usage is billed according to a water meter. The material of water piping within the residential condo units is copper.
*Hot and cold water piping is to be insulated with ½" owens-corning fiberglass low pressure pipe insulation 7-1/4 pounds per cubic foot density with a maximum K factor of 0.24 at 75 feet through out.

(2) Sanitary Sewage System:

The sanitary house line, house trap, and house sewer of sub-cellar through all twelve (12) floors are connected by gravity with 8" cast iron pipe to a 4'-0"x2'-8" city combined sewer in Canal Street. The combined sewer is still allowed in this locality.

(3) Storm Drainage System:

Area and roof drains shall be cast iron with controlled weir of a roof detention system by gravity flow through cast iron pipes to 4'-0" x 2'-8" city combined sewer in Canal Street. The catch basins are located at the intersection of Canal Street and Eldridge Street.  The cast iron grating concrete catch

basins are in fair condition and maintained by The City of New York. There will be sump pump provide at the elevator pit to ensure a proper drainage if there ever a flood occurred in the cellar where it is the lowest spot among the floor.

(4) Sprinkler System:

The building is fully sprinklered from the cellar to twelfth floor as required by New York City Building Code. The sprinkler is an approved type "Vinking Micromatic" type. The sprinkler heads model is "M", and the style is upright, pendent and concealed heads. All pipes, fittings, elbows meet the requirements of A.S.T.M code. The sprinkler system shall consist of cast iron piping.
The water pressure at street hydrant is average 36 pound per square inch.

**L.**  **Heating System:**

Heating for each residential unit will be provided by an individual gas fired heating boiler located in the Boiler Room in 5th, 6th floors, and roof level. Heat will be distributed to each space via circulation pumps and baseboard radiators, thereby providing adequate heat per New York City Building Code.

The gas fired hot water system consists of a boiler manufactured by Williamson, model number GWA-070 with an input rating of 70,000 BTU. The energy efficiency rating of equipment is 80.1% A.F.U.E. thermal. There will be one boiler for each unit and the boiler has a New York City Material Equipment Approval (MEA) number 411-00-E. The boiler manufacturer Williamson provides Limited Five–year warranty to the boilers.
The heating system are normally designed to maintain an ambient temperature of 70 Fahrenheit degrees when the outdoor temperature is zero (0) Fahrenheit degree and a fifteen-MPH wind are blowing. The units are prefabricated containing all the controls that are solid state, fan switches, and limited switches. The limit switches are designed to cut out the system when the predetermined temperature is reached. Radiator will be sheet metal baseboard. Piping will be type L copper tubing with (1) one-inch insulation of fiberglass or equivalent, bronze valves and Bell Gusset in line pump circulators.

**M.**  **Domestic Hot Water**

Domestic hot water will be supplied to each residential unit with an individual gas fired hot water heater located in the Boiler Room on the roof level. The Hot Water Heater manufacturer is A.O. Smith, model number XCV 50 with a 40,000 BTU input. The energy efficiency rating of equipment is 80% A.F.U.E. The Ambulatory Treatment Health Care Facility units will received A.O. Smith, model number XCV 50 with a 40,000 BTU input hot water heater. The energy efficiency rating of equipment is 80% A.F.U.E. The maintenance of the Hot Water Heater equipment will be the responsibility of unit owner. A.O. Smith Corporation provides warranties are limited to ten (10) years duration for the hot water heater or any of its parts.

**N.**  **Fuel:**

The fuel will be natural gas. The gas will be master metered from Keyspan and be used for space heating, cooking, dryers and hot water heating. Gas piping will be scheduled 40 steel screwed to malleable iron fittings

**O.**  **Air Conditioning:**

There will be dustless split air conditioning system installed for each apartment unit. There will be a 24,000 BTU split system with fan console by "Fujitsu", model# AOU24RCXFZ provided for the two bedroom apartment units. The condensing unit is located on the balcony or hung on the wall outside the building. The Cooling System's ability to maintain legally required conditions under anticipated weather conditions. The indoor design temperature will be a minimum of 78 degrees F for cooling. The outdoor design temperature will be summer design dry bulb temperature of 89 degrees F. The energy efficiency rating of equipment is 10.5 EER for the 23,000 BTU model and 8.2 EER for the 18,000 BTU model.

There will be no air conditioning unit provided for the first floor Ambulatory Treatment Health Care Facility units. The installation of the air conditioning unit will be the responsibility of the unit owner.

**P.     Ventilation:**

The kitchenettes, dryers, refuse chute room and residential corridors ventilation shall be equipped with vertical ducts with booster fans, which terminate to the outside air at roof. The bathrooms shall be equipped with individual fan and vertical ducts, which terminate to the outside air at roof with a gooseneck installation. There are total of three (2) Kitchenette exhaust fans consist of one (1) 900cfm units and one (1) 450cfm unit. The refuse chute rooms will receive an exhaust duct through roof with gooseneck installation. The corridor ventilation will be ducted through roof with rain cap. The boiler room and meter rooms shall be equipped with ducted ventilation for fresh air. The individual laundry closet shall have ducted exhaust terminate to the outside air at roof with gooseneck installation. The garage shall be equipped with make-up air fan which terminate to the outside air at the roof.

**Q.     Electrical System:**

All electrical wiring will be installed in accordance with the requirements of the City of New York, Electrical Control Bureau and the New York Board of Fire Underwriters. The building will be provided a 1,000 amps, 120/208-volt, 3-phase service connected to the main switch panel to be located in the cellar meter room. There will be total of seventeen (42) electrical meters for the building in which one (1) for the common usage. Each individually sub-metered service for each residential unit will have a 100-amp capacity at nominal 120/208V three-phase four wires in circuit breaker panel. There will be an average of fifteen circuits per apartment. There is one extra panel for the public spaces. Each panel will have separate fixtures and convenience outlets installed in accordance with the N.Y.C. Electrical Code including dedicated outlets for air conditioning equipment. The GFCI Receptacles is to be provided in bathrooms, kitchens, balconies, terraces and roof areas. The AFCI receptacles are to be provided in bedrooms per codes. There will be no Tamper Resistant Receptacles to be provided in this project.

There will be a video communication intercom system, including interlock system, which controls the main entrance from each unit. The intercom system is by "Aiphone" model #GTV-DES104 with a manufacturer warranty of one year.

**R.     (i) Units Lighting:**

Lighting fixtures will be provided in residential units. Each residential unit consists of (4) four types of lighting fixture. The living, dining and hallway ceiling lights by Line Voltage: recessed mounted light fixtures, model number HV-4N & WL-407B. The bedroom ceiling lights by Line Voltage: recessed mounted, model number HV402. The bathroom lights by NUVO Lighting: wall mounted incandescent lights, model number SF77-193.The kitchen lights by NUVO lighting: ceiling mounted incandescent lights, model number SF77-346. The balcony and terrace lights shall be LRBVX Lighting, wall mounted incandescent model number BR100DG.

**(ii) Public Area Lighting:**

The vestibule, lobby, corridors and refuse chute rooms will consist of energy-efficient fluorescent lighting and illumination levels of conforming to the standard requirements. The ceiling lights shall be surface mount Fluorescent model number BB217 by LAM Lighting. The stairways will consist of energy-efficient fluorescent lighting and illumination levels of conforming to the standard requirements. The lights by LAM Lighting: surface mounted fluorescent lights with wrap around lens model number BB217 with emergency ballast. The boiler room and utility room lights by LAM Lighting: surface mounted fluorescent lights with wrap around lens model number WA232-278. The front entrance and building facade will be illuminated by a weatherproof compact fluorescent light fixture, which shall give an illumination of at least two foot candles and shall be operated by a timer. The wall-mounted compact fluorescent light fixtures are by LPP Lighting, model number Lpp5642-31. The parking garage and driveway lights by LAM Lighting: surface mounted fluorescent lights with wrap around lens model number WA 232-78. The rear area back door/driveway lights by LAM Lighting: surface mounted incandescent lights model

number WA 232-78. The meter rooms, janitor closet and elevator machine controller room lights by LAM Lighting: surface mounted fluorescent lights model number WA 232-78.

.

**S.    Recreation Facilities:**

There will be an outdoor recreation space provided on the fifth floor terrace of the building. The floor of the outdoor recreation space will be finished with non-slip concrete.

**T.     Permits, Inspection and Violations:**

The following permits listed are required with their respective agencies:

Department of Buildings:
(1)  Demolition Permit; 03/05/2013 obtained
(2)  New Building Construction Permit; 06/19/2008 obtained
(3)  Plumber's Affidavit and Permit; 07/09/2012 obtained
(4)  Fence Permit, 06/19/2008 obtained

Department of Highways:
(1)  Crosswalk Use Permit;
(2)  Roadway Paving Permit;
(3)  Sidewalk Paving Permit;
(4)  Curb Work Permit;

**Department of Environmental Protection:**
(1)  Sewer Connection Permit;

Department of Water Supply, G.T.E.:
(1)  Water Tap Permit;
At this time, there are no violations outstanding.

This is a new building application and is not an asbestos project. There is no Asbestos Report can be provided.

**U.    Local Law 58 (Handicapped Access Law):**

This building is designed to comply with NYC Handicapped Access Law. The primary Entrance of the building is accessible by people having physical disabilities with a wheelchair. All usable or adaptable spaces are safe environment for all people having physical disabilities.

**V.    (i) Finish Schedule of interior spaces:**

Abbreviations:
| | |
|---|---|
| CONC – Concrete | CT – Ceramic Tile |
| GWB – Gypsum Wall Board | HW – Hard Wood |
| MRB – Moisture Resistant Board | WCB – Waterproof Cement Board |
| PNT – Painted | PT - Porcelain Tile |

(1) Finish Material Used:

Note: No materials containing asbestos are to be used in this construction:

| Use / Location | Sub-Floor | Floor | Walls | Ceiling |
|---|---|---|---|---|
| Residential Units (5th, 6th, 7th, 8th, 9th, 10th,11th & 12th Floors): | | | | |
| Living/Dining Room: | CONC. | HW | GWB/PNT | GWB/PNT |
| Kitchenette: | CONC. | CT | GWB/PNT | GWB/PNT |
| Bedroom: | CONC. | HW | GWB/PNT | GWB/PNT |
| Bathroom: | CONC. | CT | CT | GWB/PNT |
| Closets: | CONC. | HW | GWB/PNT | GWB/PNT |
| Hallway: | CONC. | HW | GWB/PNT | GWB/PNT |

Hard wood floor is of #2 pre-finished Oak 3-1/4" wide with ¾" thick plywood underlayment.

(2) Bathroom Fixtures for  hotel and residential units:

Water Closet (for all units)
Make: Kohler          Model: 3810-0          Material: Vitreous china          Color: White
Bath tub (for all units)
Make: Kohler          Model: K-715          Material: Cast iron          Color: White
Wash Basin (for all units)
Make: KDC          Model: LVU-1714W          Material: Vitreous china          Color: White

All bathrooms will have the following:
    a. Ceramic tile floors;
    b. Walls will have ceramic tile full height at all area,
    c. Wood veneer cabinets with faucet by Delta, Model : 501LF
    d. Medicine cabinet with mirror, towel bar, soap dish at tub and toilet paper holder.

(3) Kitchen Equipment:

Gas Range
Make: GE          Model: JGB630REF          Material: Stainless Steel
Refrigerator
Make: Frigidaire          Model:  FFTR1821QS          Material: Stainless Steel
Range Hood
Make: Sakura          Model: R-747 II          Material: Stainless Steel

All kitchen faucets to be Delta single lever with the pressure balance as per code;
All kitchen sinks to be stainless steel
The sponsor will provide Kitchen cabinets (base and wall cabinets) and manmade stone counter tops.
Cabinets and tops subject to change; possibly by owner prior to closing.

(4) Ambulatory Treatment Health Care Facility  and Retail stores toilet:
ADA complying Water Closet
Make: Primier          Model: #270915          Material: Vitreous china          Color: White

ADA complying Wash Basin
Make: Crane          Model: #1442V100   Material: Vitreous china          Color: White

(5) Hotel Laundry Equipment
Commercial Dryer
Make: Whirlpool          Model#: CGM 2793BQ          Material: Metal          Color: White

Commercial Washing Machine

Make: Whirlpool        Model#: CAE 2793BQ    Material: Metal        Color: White

**W.** **Finish Schedule of spaces other than residential units:**

| LEVEL | ROOM | SUB-FLOOR | FLOOR | WALLS | CEILING |
|---|---|---|---|---|---|
| Typical Residential Floor | Corridor | CONC. | CT | GWB/PNT | GWB/PNT |
| | Vestibule/Lobby | CONC. | PT | GWB/PNT | GWB/PNT |
| | Refuse chute | CONC. | CT | CONC. | GWB/PNT |
| | Utility/Mech. Room | CONC. | CONC. | CONC. | GWB/PNT |
| | Storage/Jan. Room | CONC. | CONC. | GWB/PNT | GWB/PNT |
| | Stair | CONC. | CT | GWB/PNT | GWB/PNT |
| Ambulatory Treat. H.C. Facility | Open area | CONC. | CT | GWB/PNT | GWB/PNT |
| Retail Stores | Toilet | CONC. | CT | CT | GWB/PNT |

**Y.** **Unit Information for building:**

**Residential Unit/Room Schedule**

| | Studio | | 2 Bedroom | | | |
|---|---|---|---|---|---|---|
| | No. of Apts. | No. of Rms. | No. of Apts. | No. of Rms. | Total No. of Apt. | Total No. of Rms. |
| 5th Floor | 2 | 5 | 2 | 9 | 4 | 14 |
| 6th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 7th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 8th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 9th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 10th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 11th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| 12th Floor | 0 | 0 | 4 | 18 | 4 | 18 |
| Total | 2 | 5.0 | 30 | 135.0 | 32 | 140.0 |

**Z.** **Fire or Smoke Alarm and Carbon Monoxide Devices:**

There will be minimum one ionization type smoke and carbon monoxide detector installed in each bedroom area and common corridor.

**Controlled Inspections:**

The DOB Controlled Inspections to be performed by Thomas Tung, P.E. located at 99-36 63rd Avenue, Rego Park, NY 11374

**General Statements:**

There will be no further development anticipated for this project.

As stated on the cover page of this report, the information contained herein is based upon the architectural construction drawings, shop drawings, physical inspections of site and items noted upon such drawings. All information concerning the structural element of this project was furnished to us by Structural Engineering Systems PLLC located at 214-35 42nd Avenue, 2nd Floor, Bayside, NY 11361.

Upon conversion, the following documents are to be transferred to the condo board:
1. The final As-built drawings,
2. The final balancing report for the HVAC system;
3. The operation and maintenance manuals for all mechanical systems;
4. All specified warranty.

**General Comments:**

The buildings and site will be constructed in accordance with the New York City Building Code, the Multiple Dwelling Law, the New York City Zoning Resolution and all applicable authorities and in accordance with the plans and applications on file with the Department of Buildings of the City of New York.

As a Special Risk(s):
Balconies/Terraces may not be used for any type of occupancy-including but not limited to: dining, sleeping, living room, recreation room, office, etc. To do so may result in a violation against the building being issued by the Buildings Department.

Unit Owners must notify the Managing Agent in writing when a Child or Children under the age of Eleven (11) years lives or resides (even temporarily) in the Unit. Each Residential Owner shall install at Residential Owner's expense, the required Window Guards in all windows of the Unit and shall not remove them until permitted by law in any event, without the full knowledge of the Managing Agent.

*The building will be occupied by unit owners after obtaining the FCO; where there is no temporary CO required for the building. There will be no tenant occupy the building before FCO.

*There is no substitution of fixtures, appliances, equipment and materials called for this project

*The following documents shall be transferred to the condominium management upon transfer of control:
1. Operation and maintenance (Q&M) of manuals for mechanical equipment;
2. Electronic system manual if any;
3. Re-commissioning manual (as applicable);
4. Equipment warranties if any;
5. Roof warranty;
6. Major equipment start-up sheets if any;
7. Control system as-built;
8. Original test & balance report for HVAC system if any;
9. In-door air quality report if any;
10. Final as-built drawings as maintained during construction, i.e. structural, electrical, plumbing, and shop drawings if any.

*Regarding the use of cellar- the cellar is use for parking garage and utilities room. The cellar is not use as living and sleeping accommodation.

*Regarding Roof Warranty- see section (I) (7).

Prepared By:

_____
Chang Hwa Tan, R.A. for
TAN ARCHITECT P.C.

**PLOT PLAN**
SCALE: 1/16"=1'-0"

0  4'  8'  16'  52'  292

BLOCK:           292
LOT:             16 (TENTATIVE)
HOUSE#           86
MAP:             12d
ZONE DIST.:      C6-1G
CONST. CLASS : IC

N

EXISTING 4 - STORY AND BASEMENT BRICK BUILDING

EXISTING 5 - STORY BRICK BUILDING

EXISTING YARD

EXISTING 6 - STORY BRICK BUILDING

EXISTING YARD

1-STORY

EXISTING 1-STORY STUCCO

EXISTING 2 - STORY BRICK BUILDING

4-STORY

4-STORY

**PROPOSED 12-STORY RESIDENTIAL BUILDING**
HOUSE  #86
NB# 104844144    FIRST FL EL: VARIES

4-STORY

ELDRIDGE STREET (50'-0" WIDE)

ASPHALT PAVEMENT

12" WATER MAIN

SEWER LINE

CONC. CURB WITH METAL FACE

CONC. CURB WITH METAL FACE

PARTY WALL

OPEN SPACE

FIRE HYDRANT

EXISTING TRAFFIC LIGHT POLE

EXISTING TRAFFIC SIGN

CONC. PVMT.

METAL GRATE

CONC. CURB WITH METAL FACE

FIRE HYDRANT

ASPHALT PAVEMENT

12" WATER MAIN

COMB. SEWER

RIM EL.=44.13 SEALED

RIM EL.=44.13 INV. EL.=30.81

METAL GRATE

CONC. PVMT.

**CANAL STREET** (75'-0" WIDE)

20" WATER MAIN

W.V.

FIRE HYDRANT

CONC. CURB WITH METAL FACE

G.V.

M.C.

# SITE PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



# BUILDING ELEVATION

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



# CELLAR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







# 1ST FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



# 2ND FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







# 3RD FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







# 4TH FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







# 5TH FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.





Case 1:20-cv-06369-FB-TAM   Document 90-1   Filed 01/02/24   Page 85 of 155 PageID #: 1806



# 6TH FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







# 7TH - 12TH FLOOR PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







HOT WATER HEATER
MECHANICAL ROOM

# ROOF PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N



0    4'    8'         16'



ELEVATOR
MACHINE
ROOM

# ELEVATOR MACH ROOM PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.







22'-4"

21'-4"

DIESEL GENERATOR
156" X 54" X 64"
WEIGHT 8157 LBS

# ELEVATOR MACH ROOM PLAN

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N



0    4'    8'         16'



14'-5"

86'-5"

13'-6"

34'-1"

35'-11"

75'-4"

## RETAIL STORE
## UNIT-S8

FLOOR AREA: 3,114.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.





KEYPLAN

S7

S8



0   4'   8'   16



39'-3"

14'-5"

44'-5"

19'-3"

STORAGE
ROOM

# RETAIL STORE
## UNIT-S7

FLOOR AREA: 1,416.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N



KEYPLAN

S7

S8



0    4'    8'         16'



RETAIL STORE
UNIT-S6

FLOOR AREA: 1,406.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



KEYPLAN



N



0    4'    8'    16'



H.C.
TOILET

11'-11"

36'-7"

35'-1"

18'-1"

## RETAIL STORE
## UNIT-S5

FLOOR AREA: 769.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



KEYPLAN

M1
S1
S2
S3 | S4 | S5 | S6



0      4'      8'

12'-3"

H.C.
TOILET

46'-2"

33'-7"

18'-5"

# RETAIL STORE
## UNIT-S4

FLOOR AREA: 997.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

KEYPLAN

M1

S1
S2
S3  S4  S5  S6

N

0    4'    8'



H.C.
TOILET

16'-1"

9'-1"

43'-3 1/2"

RETAIL STORE
UNIT-S3

FLOOR AREA: 773.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.





KEYPLAN

M1

S1
S2
S3 | S4 | S5 | S6



0      4'      8'



44'-3"

10'-7"

16'-9"

H.C.
TOILET

**RETAIL STORE**
**UNIT-S2**

FLOOR AREA: 772.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N



KEYPLAN

M1

S1
S2
S3 | S4 | S5 | S6



0         4'        8'



16'-4 1/2"

F.D.

H.C.
TOILET

11'-8"

44'-3"

5'-1"

RETAIL STORE
UNIT-S1

FLOOR AREA: 641.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N



KEYPLAN

M1

S1
S2
S3  S4  S5  S6



0        4'        8'

26'-0"

15'-3"

24'-3"

10'-8"

H.C.
TOILET

# RETAIL STORE
## UNIT-M1

FLOOR AREA: 689.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.





KEYPLAN

| | M1 |
| S1 | |
| S2 | |
| S3 | S4 | S5 | S6 |



0        4'        8'



BALCONY
12'-0" x 6'-0"

BEDROOM
9'-6" x 9'-6"

LIVING/DINING
11'-4" x 9'-6"

KIT'TE
9'-1" x 3'-5"

M. BEDROOM
14'-8" x 8'-0"

BATH

KEYPLAN

D
C B A

OUTDOOR RECREATION AREA

UNIT-5A

(2 BEDROOM)
FLOOR AREA: 540.0 S.F.
BALCONY: 72.0 S.F.
TOTAL: 612.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0     4'     8



**BATH**

**KIT'TE**
7'-2" x 7'-2"

**LIVING/ SLEEPING/ DINING**
18'-2" x 12'-11"

# UNIT-5B

(STUDIO)
FLOOR AREA: 320.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



KEYPLAN

D
C   B   A

OUTDOOR RECREATION AREA



N

0          4'          8



KIT'TE
7'-10" x 5'-9"

BATH

LIVING/ SLEEPING/ DINING
25'-6" x 7'-10"

UNIT-5C
(STUDIO)
FLOOR AREA: 340.0 S.F.



KEYPLAN

D
C   B   A

OUTDOOR RECREATION AREA

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.



N

0        4'        8



**BEDROOM**
14'-2" x 8'-4"

**BATH**

**KIT'TE**
8'-6" x 5'-6"

**LIVING/DINING**
11'-8" x 8'-6"

**M. BEDROOM**
11'-8" x 8'-0"

**UNIT-5D**
(2 BEDROOM)
FLOOR AREA: 554.0 S.F.

**KEYPLAN**

D
C   B   A

OUTDOOR RECREATION AREA

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8



BALCONY
12'-0" x 6'-0"

LIVING/DINING
9'-7" x 9'-10"

KIT'TE
5'-0" x 6'-10"

BEDROOM
8'-8" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-6A

(2 BEDROOM)
FLOOR AREA: 678.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 806.0 S.F.
All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0    4'    8'



BATH

KIT'TE
8'-0" x 6'-6"

BATH

BEDROOM
9'-8" x 9'-3"

LIVING/DINING
8'-3" x 10'-2"

M. BEDROOM
8'-7" x 10'-2"

CL.

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-6B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8



KIT'TE
8'-0" x 5'-9"

BATH

BATH

M. BEDROOM
9'-6" x 9'-8"

LIVING/DINING
9'-6" x 9'-8"

BEDROOM
9'-7" x 9'-3"

BALCONY
12'-0" x 4'-8"

KEYPLAN

D
C
B
A

**UNIT-6C**
(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8



BEDROOM
14'-2" x 8'-8"

BATH

BALCONY
4'-8" x 12'-0"

D
2-BR

LIVING/DINING
12'-4" x 9'-0"

KIT'TE
10'-8" x 4'-6"

M. BEDROOM
11'-8" x 10'-0"

BATH

BALCONY
12'-0" x 4'-8"

UNIT-6D

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

KEYPLAN

D C B A

0   4'   8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2−BR

BEDROOM
8'-8" x 9'-10"

LIVING/DINING
9'-7" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

KEYPLAN

D C B A

BALCONY
12'-0" x 4'-8"

UNIT-7A
(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.
All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0    4'    8'



BATH

KIT'TE
8'-0" x 6'-6"

BATH

BEDROOM
9'-8" x 9'-3"

LIVING/DINING
8'-3" x 10'-2"

M. BEDROOM
8'-7" x 10'-2"

CL.

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

# UNIT-7B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0          4'          8



KIT'TE
8'-0" x 5'-9"

BATH

BATH

M. BEDROOM
9'-6" x 9'-8"

LIVING/DINING
9'-6" x 9'-8"

BEDROOM
9'-7" x 9'-3"

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

# UNIT-7C

(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8



**BEDROOM**
14'-2" x 8'-8"

**BATH**

**BALCONY**
4'-8" x 12'-0"

**D**
2-BR

**LIVING/DINING**
12'-4" x 9'-0"

**KIT'TE**
10'-8" x 4'-6"

**M. BEDROOM**
11'-8" x 10'-0"

**BATH**

**BALCONY**
12'-0" x 4'-8"

**UNIT-7D**

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

**KEYPLAN**

D   C   B   A

N

0        4'        8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2-BR

LIVING/DINING
9'-7" x 9'-10"

BEDROOM
8'-8" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-8A

(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8'



BATH

KIT'TE
8'-0" x 6'-6"

BATH

BEDROOM
9'-8" x 9'-3"

LIVING/DINING
8'-3" x 10'-2"

M. BEDROOM
8'-7" x 10'-2"

CL.

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-8B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8



KIT'TE
8'-0" x 5'-9"

BATH

BATH

M. BEDROOM
9'-6" x 9'-8"

LIVING/DINING
9'-6" x 9'-8"

BEDROOM
9'-7" x 9'-3"

BALCONY
12'-0" x 4'-8"

KEYPLAN

D    C    B    A

UNIT-8C

(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0    4'    8



BEDROOM
14'-2" x 8'-8"

BATH

BALCONY
4'-8" x 12'-0"

**D**
2–BR

LIVING/DINING
12'-4" x 9'-0"

KIT'TE
10'-8" x 4'-6"

M. BEDROOM
11'-8" x 10'-0"

BATH

BALCONY
12'-0" x 4'-8"

# UNIT-8D

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

KEYPLAN

D | C | B | A

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0    4'    8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2−BR

LIVING/DINING
9'-7" x 9'-10"

BEDROOM
8'-8" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-9A

(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0    4'    8'



**BATH**

**KIT'TE**
8'-0" x 6'-6"

**BATH**

**BEDROOM**
9'-8" x 9'-3"

**LIVING/DINING**
8'-3" x 10'-2"

**M. BEDROOM**
8'-7" x 10'-2"

**CL.**

**BALCONY**
12'-0" x 4'-8"

**KEYPLAN**

D   C   B   A

# UNIT-9B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0    4'    8



**KIT'TE**
8'-0" x 5'-9"

**BATH**

**BATH**

**M. BEDROOM**
9'-6" x 9'-8"

**LIVING/DINING**
9'-6" x 9'-8"

**BEDROOM**
9'-7" x 9'-3"

**BALCONY**
12'-0" x 4'-8"

**KEYPLAN**

D   C   B   A

# UNIT-9C

(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8'



BEDROOM
14'-2" x 8'-8"

BATH

BALCONY
4'-8" x 12'-0"

D
2-BR

LIVING/DINING
12'-4" x 9'-0"

KIT'TE
10'-8" x 4'-6"

M. BEDROOM
11'-8" x 10'-0"

BATH

BALCONY
12'-0" x 4'-8"

UNIT-9D

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

KEYPLAN

D  C  B  A

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0    4'    8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2-BR

LIVING/DINING
9'-7" x 9'-10"

BEDROOM
8'-8" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D  C  B  A

# UNIT-10A

(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0      4'      8'



BATH

KIT'TE
8'-0" x 6'-6"

BATH

BEDROOM
9'-8" x 9'-3"

LIVING/DINING
8'-3" x 10'-2"

M. BEDROOM
8'-7" x 10'-2"

CL.

BALCONY
12'-0" x 4'-8"

KEYPLAN

D
C B A

UNIT-10B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8



KIT'TE
8'-0" x 5'-9"

BATH

BATH

M. BEDROOM
9'-6" x 9'-8"

LIVING/DINING
9'-6" x 9'-8"

BEDROOM
9'-7" x 9'-3"

BALCONY
12'-0" x 4'-8"

KEYPLAN

D  C  B  A

UNIT-10C

(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0    4'    8



BEDROOM
14'-2" x 8'-8"

BATH

BALCONY
4'-8" x 12'-0"

D
2-BR
LIVING/DINING
12'-4" x 9'-0"

KIT'TE
10'-8" x 4'-6"

M. BEDROOM
11'-8" x 10'-0"

BATH

BALCONY
12'-0" x 4'-8"

UNIT-10D

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

KEYPLAN

D   C   B   A

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2-BR

LIVING/DINING
9'-7" x 9'-10"

BEDROOM
8'-8" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

**UNIT-11A**

(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8'



**BATH**

**KIT'TE**
8'-0" x 6'-6"

**BATH**

**BEDROOM**
9'-8" x 9'-3"

**LIVING/DINING**
8'-3" x 10'-2"

**M. BEDROOM**
8'-7" x 10'-2"

**CL.**

**BALCONY**
12'-0" x 4'-8"

**KEYPLAN**

D    C    B    A

# UNIT-11B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0        4'        8



KIT'TE
8'-0" x 5'-9"

BATH

BATH

M. BEDROOM
9'-6" x 9'-8"

LIVING/DINING
9'-6" x 9'-8"

BEDROOM
9'-7" x 9'-3"

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-11C

(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0   4'   8'



**BEDROOM**
14'-2" x 8'-8"

**BATH**

**BALCONY**
4'-8" x 12'-0"

**D**
2–BR

**LIVING/DINING**
12'-4" x 9'-0"

**KIT'TE**
10'-8" x 4'-6"

**M. BEDROOM**
11'-8" x 10'-0"

**BATH**

**BALCONY**
12'-0" x 4'-8"

**UNIT-11D**

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

**KEYPLAN**

D   C   B   A

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0      4'      8'



KIT'TE
5'-0" x 6'-10"

BALCONY
12'-0" x 6'-0"

A
2−BR

BEDROOM
8'-8" x 9'-10"

LIVING/DINING
9'-7" x 9'-10"

BATH

M. BEDROOM
12'-6" x 10'-6"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D    C    B    A

# UNIT-12A

(2 BEDROOM)
FLOOR AREA: 673.0 S.F.
BALCONY 1: 72.0 S.F.
BALCONY 2: 56.0 S.F.
 TOTAL: 801.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0    4'    8'



BATH

KIT'TE
8'-0" x 6'-6"

BATH

BEDROOM
9'-8" x 9'-3"

LIVING/DINING
8'-3" x 10'-2"

M. BEDROOM
8'-7" x 10'-2"

CL.

BALCONY
12'-0" x 4'-8"

KEYPLAN

D | C | B | A

UNIT-12B

(2 BEDROOM)
FLOOR AREA: 507.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 563.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforseen conditions in accordance with the offering.

N

0          4'          8



**KIT'TE**
8'-0" x 5'-9"

**BATH**

**BATH**

**M. BEDROOM**
9'-6" x 9'-8"

**LIVING/DINING**
9'-6" x 9'-8"

**BEDROOM**
9'-7" x 9'-3"

**BALCONY**
12'-0" x 4'-8"

**KEYPLAN**

D  C  B  A

**UNIT-12C**
(2 BEDROOM)
FLOOR AREA: 513.0 S.F.
BALCONY 1: 56.0 S.F.
TOTAL: 569.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0          4'          8



BEDROOM
14'-2" x 8'-8"

BATH

BALCONY
4'-8" x 12'-0"

D
2-BR

LIVING/DINING
12'-4" x 9'-0"

KIT'TE
10'-8" x 4'-6"

M. BEDROOM
11'-8" x 10'-0"

BATH

BALCONY
12'-0" x 4'-8"

KEYPLAN

D   C   B   A

UNIT-12D

(2 BEDROOM)
FLOOR AREA: 646.0 S.F.
BALCONY 1: 56.0 S.F.
BALCONY 2: 56.0 S.F.
TOTAL: 758.0 S.F.

All dimensions are approximate and are subject to normal construction variances and tolerances.
Sponsor reserves the right to make changes due to unforeseen conditions in accordance with the offering.

N

0        4'        8'

## SECTION F        OFFERING PRICES AND RELATED INFORMATION

### 86 CANAL CONDOMINIUM

**86 Canal Street**
**New York, NY10002**

### SCHEDULE A
**(July 1, 2018 - June 30, 2019)**
**(Amended)(A)**

| Unit No. | No. of Bedroom + Baths | Net Square Footage | Balcony /Terrace | Gross Square Footage | Offering Price | %Common Interest | Est. Monthly Common Charges | Projected Est. Monthly Real Estate Taxes | Projected First Year's Monthly Carrying Charges | Projected Est. Annual Real Estate Taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2)(a) | (2)(b) | (2)(c) | (3) | (4) | (5) | (6) | (7) | (8) |
| M1 | 0-0.5 | 608 | | 608 | $861,000 | 1.848% | $249.61 | $725.75 | $975.36 | $8,708.99 |
| S1 | 0-0.5 | 641 | | 641 | $1,350,000 | 1.720% | $232.32 | $675.48 | $907.80 | $8,105.77 |
| S2 | 0-0.5 | 772 | | 772 | $965,000 | 2.072% | $279.86 | $813.72 | $1,093.58 | $9,764.63 |
| S3 | 0-0.5 | 773 | | 773 | $966,000 | 2.074% | $280.13 | $814.50 | $1,094.64 | $9,774.06 |
| S4 | 0-0.5 | 894 | | 894 | $914,362 | 2.675% | $361.31 | $1,050.53 | $1,411.84 | $12,606.36 |
| S5 | 0-0.5 | 769 | | 769 | $786,687 | 2.063% | $278.65 | $810.18 | $1,088.83 | $9,722.22 |
| S6 | 0-0.5 | 1,005 | | 1,005 | $2,030,000 | 3.774% | $509.75 | $1,482.13 | $1,991.88 | $17,785.58 |
| S7 | 0 | 1,442 | | 1,442 | $850,000 | 1.825% | $246.50 | $716.72 | $963.22 | $8,600.60 |
| S8 | 0 | 3,114 | | 3,114 | $2,200,000 | 4.010% | $541.62 | $1,574.81 | $2,116.44 | $18,897.76 |
| HC | 0 | 19,320 | | 19,320 | $20,250,000 | 43.468% | $5,871.16 | $17,070.82 | $22,941.98 | $204,849.87 |
| 5A | 2-1 | 540 | 72 | 612 | $459,000 | 0.985% | $133.04 | $386.83 | $519.87 | $4,641.97 |
| 5B | 0-1 | 320 | | 320 | $272,000 | 0.584% | $78.88 | $229.35 | $308.23 | $2,752.19 |
| 5C | 0-1 | 340 | | 340 | $289,000 | 0.620% | $83.74 | $243.49 | $327.23 | $2,921.85 |
| 5D | 2-1 | 554 | | 554 | $580,000 | 1.011% | $136.55 | $397.04 | $533.60 | $4,764.50 |
| 6A | 2-2 | 610 | 128 | 738 | $820,000 | 1.073% | $144.93 | $421.39 | $566.32 | $5,056.68 |
| 6B | 2-2 | 507 | 56 | 563 | $620,000 | 0.925% | $124.94 | $363.27 | $488.21 | $4,359.21 |
| 6C | 2-2 | 513 | 56 | 569 | $436,000 | 0.936% | $126.42 | $367.59 | $494.01 | $4,411.05 |
| 6D | 2-2 | 646 | 112 | 758 | $800,000 | 1.179% | $159.25 | $463.02 | $622.26 | $5,556.23 |
| 7A | 2-2 | 673 | 128 | 801 | $572,000 | 1.228% | $165.86 | $482.26 | $648.13 | $5,787.15 |
| 7B | 2-2 | 507 | 56 | 563 | $431,000 | 0.925% | $124.94 | $363.27 | $488.21 | $4,359.21 |
| 7C | 2-2 | 513 | 56 | 569 | $436,000 | 0.936% | $126.42 | $367.59 | $494.01 | $4,411.05 |
| 7D | 2-2 | 646 | 112 | 758 | $800,000 | 1.179% | $159.25 | $463.02 | $622.26 | $5,556.23 |

| Unit No. | No. of Bedroom + Baths | Net Square Footage | Balcony /Terrace | Gross Square Footage | Offering Price | %Common Interest | Est. Monthly Common Charges | Projected Est. Monthly Real Estate Taxes | Projected First Year's Monthly Carrying Charges | Projected Est. Annual Real Estate Taxes |
|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2)(a) | (2)(b) | (2)(c) | (3) | (4) | (5) | (6) | (7) | (8) |
| 8A | 2-2 | 673 | 128 | 801 | $592,000 | 1.271% | $171.67 | $499.15 | $670.82 | $5,989.79 |
| 8B | 2-2 | 507 | 56 | 563 | $446,000 | 0.957% | $129.26 | $375.83 | $505.10 | $4,510.01 |
| 8C | 2-2 | 513 | 56 | 569 | $451,000 | 0.968% | $130.75 | $380.15 | $510.90 | $4,561.85 |
| 8D | 2-2 | 646 | 112 | 758 | $568,000 | 1.219% | $164.65 | $478.73 | $643.38 | $5,744.73 |
| 9A | 2-2 | 673 | 128 | 801 | $592,000 | 1.271% | $171.67 | $499.15 | $670.82 | $5,989.79 |
| 9B | 2-2 | 507 | 56 | 563 | $446,000 | 0.957% | $129.26 | $375.83 | $505.10 | $4,510.01 |
| 9C | 2-2 | 513 | 56 | 569 | $451,000 | 0.968% | $130.75 | $380.15 | $510.90 | $4,561.85 |
| 9D | 2-2 | 646 | 112 | 758 | $568,000 | 1.219% | $164.65 | $478.73 | $643.38 | $5,744.73 |
| 10A | 2-2 | 673 | 128 | 801 | $606,000 | 1.301% | $175.72 | $510.93 | $686.65 | $6,131.17 |
| 10B | 2-2 | 507 | 56 | 563 | $456,000 | 0.979% | $132.23 | $384.47 | $516.71 | $4,613.69 |
| 10C | 2-2 | 513 | 56 | 569 | $700,000 | 0.992% | $133.99 | $389.58 | $523.57 | $4,674.96 |
| 10D | 2-2 | 646 | 112 | 758 | $581,000 | 1.247% | $168.43 | $489.72 | $658.15 | $5,876.69 |
| 11A | 2-2 | 673 | 128 | 801 | $606,000 | 1.301% | $175.72 | $510.93 | $686.65 | $6,131.17 |
| 11B | 2-2 | 507 | 56 | 563 | $456,000 | 0.979% | $132.23 | $384.47 | $516.71 | $4,613.69 |
| 11C | 2-2 | 513 | 56 | 569 | $462,000 | 0.992% | $133.99 | $389.58 | $523.57 | $4,674.96 |
| 11D | 2-2 | 646 | 112 | 758 | $581,000 | 1.247% | $168.43 | $489.72 | $658.15 | $5,876.69 |
| 12A | 2-2 | 673 | 128 | 801 | $930,000 | 1.445% | $195.17 | $567.48 | $762.66 | $6,809.79 |
| 12B | 2-2 | 507 | 56 | 563 | $507,000 | 1.089% | $147.09 | $427.67 | $574.76 | $5,132.09 |
| 12C | 2-2 | 513 | 56 | 569 | $513,000 | 1.101% | $148.71 | $432.39 | $581.10 | $5,188.64 |
| 12D | 2-2 | 646 | 112 | 758 | $646,000 | 1.387% | $187.34 | $544.70 | $732.04 | $6,536.46 |
| Total | | 47,402 | 2,536 | 49,938 | $48,846,049 | 100.0000% | $13,506.85 | $39,272.16 | $52,779.01 | $471,265.92 |

Note 1: Balconies and/or Terraces are uninhabitable space and such spaces may not be legally used as a bedroom or living room. To do so may result in a building code violation being issued for the building.

Note 2: Commercial Unit M1,Units S1 through S8 are uninhabitable units and such spaces may not be legally used as a bedroom or living room. To do so may result in a building code violation being issued for the building.

## AMENDED AND RESTATED SHAREHOLDERS AGREEMENT
## OF
## 88 CANAL REALTY INC

THIS AMENDED AND RESTATED SHAREHOLDERS AGREEMENT OF 88 CANAL REALTY INC(Hereinafter the "**Shareholders Agreement**") is made effective as of September 5, 2017 by the undersigned (Hereinafter the "**Shareholder(s)**").

## RECITALS

WHEREAS, 88 Canal Realty Inc(Hereinafter the "**Corporation"**) was formed and incorporated on April 13, 2010 under the laws of and in the State of New York;

WHEREAS, the Corporation acquired certain parcel of land located in Block 292 Lot 16 (now subdivided into Lots 1101 and 1142) in the Borough of Manhattan, City and State of New York, also known by the street address: 86 Canal Street, New York, New York(Hereinafter the "**Premises**"), and has constructed a residential/commercial mixed condominium thereon (Hereinafter the "**Condominium**");

WHEREAS, it is the intent of all the Shareholder(s) of the Corporation to amend and restate the Shareholders Agreement in its entirety and provide for the structure of the Corporation, specifying the powers, rights, duties, obligations and liabilities of the Shareholder(s) as well as the powers, rights, duties, obligations and liabilities of the Corporation officers under the laws of the State of New York;

NOW THEREFORE, in consideration of promises, covenants, and other valuable consideration, receipt and sufficiency of which is hereby acknowledged and shall not be challenged in any court or authorities of competent jurisdiction, the Shareholder(s) agree as follows:

## SECTION 1  Purpose of Forming the Corporation

§1.1 Unless amended by duly executed agreement, each Shareholder agrees that the sole purpose of the Corporation has been since its formation and shall continue to be to acquire, own, hold, sell, lease, develop, rehabilitate, build, finance, refinance, conduct the affairs of, maintain and operate (collectively, "Operate") the Premises and to engage in all activities as may be necessary, appropriate, proper, incidental to or advisable in connection with the ownership of the Premises. Notwithstanding anything contained herein to the contrary, the Corporation shall not engage in any business, and it shall have no purpose, unrelated to the Premises and shall not acquire any real property or own assets other than those related to the Premises and otherwise in furtherance of the purpose of the Corporation stated herein.

## SECTION 2  Board of Directors

§2.1.   The Board of Directors shall consist of three(3) members and all of whom shall be member(s) or officer(s) of the Corporation.

§2.2.   The Shareholder(s) hereby appoint Fa Nan Lu, Rose Cheng and Sang Cheung Lee to the Board of Directors, effective immediately.

§2.3.   The Board of Directors shall elect President, Vice President, Secretary and Treasurer, and other officers as necessary at a Board meeting to be duly held.

## SECTION 3   Managing Powers

§3.1.   The President and Vice President shall be the officer(s) conducting the ordinary business affairs of the Corporation.

§3.2.   The signature of the President or Vice President shall be required to authorize any business transaction involving values exceeding $10,000.00.

§3.3.   An account shall be established in the name of the Corporation or other necessary arrangement shall be made to achieve the purpose of §3.2.

§3.4   Notwithstanding anything to the contrary, the Board of Directors may not make any major management decisions(as defined below) without obtaining the written consent of the Shareholder(s) who hold the majority interest in the Corporation.

§3.5   "Major management decisions" is defined as;

A. employing any individual, hiring any consultants or professional firms (including, without limitation, any attorneys, accountants, architects or engineers) or establishing or entering into any employment contracts, consultancy agreements (or other similar agreements or arrangements), agreements with respect to salaries or bonus compensation or other employee benefit plans;

B. retaining any attorney or accountant by the Corporation;

C. entering into, extending or terminating any sale and purchase agreement of the condominium units if the sales and purchase price exceeds One Million Dollars ($1,000,000.00) in case of a residential condominium unit, or Two Million Dollars($2,000,000.00) in case of a commercial condominium unit in the Condominium;

D. entering into, renewing or terminating any property management, leasing or development contract if any such agreement, renewal or termination will result in costs and expenses by the Corporation in excess of Ten Thousand Dollars ($10,000.00);

E. admitting a person as a shareholder;

F. acquiring, selling, assigning, or otherwise transferring any interest in any property other than the Premises  as provided herein;

G. creating any indebtedness for borrowed money whether or not secured;

H. making, executing or delivering on behalf of the Corporation any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond;

2

I. obligating the Corporation or any shareholder or officer as a surety, guarantor or accommodation party to any obligation;

J. confessing any judgment on behalf of the Corporation;

K. doing any act which makes it impossible to carry on the ordinary business of the Corporation;

L. obligating the Corporation in any manner for a liability in excess of Ten Thousand Dollars($10,000.00);

M. approving the dissolution of the Corporation;

N. approving the merger of the Corporation with another Corporation or any other business entity;

O. adopting, amending, restating or revoking the Certificate of Incorporation, subject to this Shareholders Agreement and the Business Corporation Law of the State of New York; and

P. without limiting any of the foregoing, any other matter determined from time to time by Shareholders, who hold the majority interest in the Corporation, to require the approval, or be subject to the modification by, Shareholders (including, without limitation, the establishment of rules and procedures relating to the affairs and dealings of the Corporation).

## SECTION 4   Compensation of Board Members and Officers

§4.1 The Board of Directors and Corporation officers shall not be compensated for their services rendered to the Corporation.

## SECTION 5   Issue of Shares of Stock

§5.1 Pursuant to the Certificate of Incorporation, the total number of shares of common stock which the Corporation shall have authority to issue is Two Hundred (200) without par value.

§5.2 The shares of common stock are issued and thereafter outstanding as follows:

See Schedule A hereto attached.

All of the issued and outstanding shares are fully paid for and non-assessable.

## SECTION 6   Capital and Contributions

§6.1.   The Shareholder(s) have made adequate capital contributions to the Corporation in exchange for the shares of common stock that were issued to each of them.

## SECTION 7   Distribution of Dividends

§7.1   The Corporation shall distribute dividends to the Shareholder(s) from time to time in such manner as determined by the Board of Directors.

**SECTION 8   Profits and Losses**

§8.1.   Each Shareholder shall be entitled to the profits in proportion to the number of shares they hold in the Corporation and shall bear losses thereof accordingly.

§8.2.   Intentionally deleted.

**SECTION 9   Voting Rights**

§9.1   Every Shareholder of record entitled to vote at any meeting shall be entitled to one vote for each share of common stock entitled to vote and held by him/her of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any corporate action shall be authorized by a majority of the votes cast in favor of or against such action by the holders of shares entitled to vote thereon except as may be otherwise provided by statute or the Certificate of Incorporation, as amended.

**SECTION 10 Transfer or Sale of Shares of Stock**

§10.1   No share of stock shall be transferred or sold to any outside individual or entity without being first offered on similar terms and conditions to the Shareholder(s) of the record and upon written consent of such Shareholder(s) who hold a majority interest in the Corporation, which consent shall not be unreasonably withheld.

§10.2   All costs and expenses incurred by the Corporation in connection with the transfer of shares of stock, including any filing fees, and the fees and disbursements of counsel, shall be paid by the transferor shareholder

**SECTION 11 Termination or Dissolution of the Corporation**

§11.1  The term of the Corporation is perpetual unless terminated and dissolved by an amendment duly adopted and filed by the Corporation.

**SECTION 12 General Provisions**

§12.1   Any remaining rights, powers, duties, obligations and liabilities of the Board of Directors, officers and Shareholder(s) of the Corporation that have not been provided for in this Shareholders Agreement shall be governed by the Certificate of Incorporation, as amended from time to time, the Business Corporation Law of the State of New York, and other governing corporate laws, statutes, regulations, decisions, rules, or ordinance of the State of New York.

§12.2   (a)This Shareholders Agreement is effective when it is executed by the shareholder(s) and shall be binding upon and inure to the benefit of the Corporation and the shareholder(s) hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns.

4

(b) This Shareholders Agreement may be (i) executed in several counterparts, all of which shall constitute one and the same instrument and (ii) delivered by telecopy, facsimile or in portable document format (PDF) by electronic mail (which shall be deemed an original for all purposes).

§12.3  This Shareholders Agreement contains the entire agreement among the parties with respect to the matters contained herein.  Except as otherwise expressly provided elsewhere in this Shareholders Agreement, this Shareholders Agreement may not be altered, modified or changed except by a written amendment duly executed by all parties hereto at the time of such alteration, modification or change.

§12.4  In the event any provision of this Shareholders Agreement is held to be illegal, invalid or unenforceable to any extent, the legality, validity and enforceability of the remainder of this Shareholders Agreement shall not be affected thereby and shall remain in full force and effect and shall be enforced to the greatest extent permitted by law.

§12.5 This Shareholders Agreement shall be governed by and construed according to the laws of the State of New York without regard to principles of conflict of law.

SIGNATURES ON NEXT PAGE

.

**IN WITNESS WHEREOF**, the following Shareholder(s) have set their hand and seal the day and year first above written.

**SHAREHOLDER(S)**

_____
Wing Fung Chau

_____
Bo Jin Zhu

_____
Rose Cheng

_____
Fa Nan Lu

_____
Gui Yang

_____
Sang Cheung Lee

## SCHEDULE A

| Name of Shareholder | Address/Office | Share(s) of Common Stock |
| --- | --- | --- |
| Wing Fung Chau | 3237 214th Place, Bayside, NY11361 | 35 |
| Bo Jin Zhu | 60 Henry Street, Apt#15C, New York, NY10002 | 33 |
| Rose Cheng | 11 E. Broadway, Suite 7B, New York, NY10038 | 33 |
| Fa Nan Lu | 661 52nd Street, 1st Floor, Brooklyn, NY11220 | 33 |
| Gui Yang | 148 Madison Street, 4F, New York, NY10002 | 33 |
| Sang Cheung Lee | 50 Henry Street, 5B, New York, NY10002 | 33 |

88 CANAL REALTY INC

UNANIMOUS WRITTEN CONSENT

OF

THE  BOARD OF DIRECTORS

September 5, 2017

THE UNDERSIGNED, being all of the members of the Board of Directors (the "**Board**") of 88 Canal Realty Inc, a New York corporation (the "**Corporation**"), acting without a meeting pursuant to Section 708(b) of the Business Corporation Law of the State of New York, hereby unanimously consent to and agree to the adoption of the following resolutions:

**Appointment of Officers**

RESOLVED, that the persons set forth below are hereby appointed and elected officers of the Corporation to serve in the capacity or capacities set forth opposite such person's name below:

| Officer | Title |
|---|---|
| Fa Nan Lu | President |
| Rose Cheng | Vice President and Treasurer |
| Sang Cheung Lee | Secretary |

and it is further

**Bank Accounts**

RESOLVED, that the Corporation may establish in its name deposit accounts with a bank or trust Corporation, upon such terms and conditions as may be agreed upon with said bank or trust Corporation, and that the officers of the Corporation are hereby authorized to establish such accounts and each officer of the Corporation is authorized to adopt and certify on behalf of the Corporation any resolution necessary to establish such accounts; and it is further

**Further Action**

RESOLVED, that the officers of the Corporation are hereby authorized and directed to execute any documents and to perform any other acts on the Corporation's behalf that the officers deems appropriate to carry out fully the foregoing resolutions; and it is further

RESOLVED That the Board of Directors have hereby adopted the Corporation By-Laws(See Exhibit I hereto attached); and it is further

RESOLVED that the Corporation shall sell and convey all of the interest to potential purchasers that the Corporation is currently holding in the condominium known as 86 Canal Condominium located at 86 Canal Street, New York, New York (Block 292 Base Lot 16) (subdivided lots 1101 through 1142), Borough of Manhattan, City and State of New York, together with all the improvements or buildings thereon; and it is further

RESOLVED that either President Fa Nan Lu or Vice President Rose Cheng is hereby authorized and empowered to: (i) negotiate, prepare, execute and deliver, in the name and on behalf of the Corporation, each of the sales and conveyance documents, and any other agreements, documents and instruments, as may be required in connection with the sale and conveyance, with such changes, modifications or amendments as the President or Vice President, in his or her sole discretion, may approve, the President or Vice President's execution and delivery thereof to be conclusive evidence of such approval; and (ii) cause the Corporation to perform the obligations and carry out the duties of the Corporation thereunder; and it is further

RESOLVED, that President or Vice President be, and hereby is, authorized, empowered and directed to take from time to time, in the name and on behalf of the Corporation, all such action and to execute, deliver and file any and all such certificates, instruments, agreements and other documents, as he or she considers necessary, appropriate or convenient to carry into effect the purposes and intent of any and all of the foregoing resolutions; and it is further

RESOLVED, that any acts of the President or Vice President and of any person or persons designated and authorized to act by the President or Vice President, which acts would have been authorized by the foregoing resolutions except that such acts were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, approved and adopted as acts in the name and on behalf of the Corporation; and it is further

RESOLVED, that any person dealing with the President or Vice President authorized by the foregoing resolutions, in connection with any of the foregoing matters shall be conclusively entitled to rely upon the authority of the President or Vice President and by his or her execution of any document, agreement or instrument, the same being a valid and binding obligation of the Corporation enforceable in accordance with its terms; and it is further

RESOLVED, that the undersigned hereby waive any and all irregularities of notice, with respect to the time and place of meeting, and consents to the transaction of all business represented by this Unanimous Written Consent; and it is further

RESOLVED, that a facsimile, telecopy or any other reproduction of this Unanimous Written Consent may be executed by the undersigned, and an executed copy of this Unanimous Written Consent may be delivered by the undersigned by facsimile transmission electronic mail in Portable Document Format *(*PDF*)*, or other similar instantaneous electronic transmission device or format pursuant to which the signature of or on behalf of the undersigned can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes; and it is further

RESOLVED, that this Unanimous Written Consent may be executed in any number of counterparts, and each counterpart hereof shall be deemed to be an original instrument, and all such counterparts together shall constitute but one consent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this instrument effective as of the date first written above.

_____
Fa Nan Lu

_____
Rose Cheng

_____
Sang Cheung Lee

3

**EXHIBIT I**

# BY-LAWS

## OF

## 88 CANAL REALTY INC

## ARTICLE  I

### OFFICES

     1.1.    <u>Principal Office</u> - The principal office of the Corporation shall be as set forth in its Certificate of Incorporation.

     1.2.    <u>Additional Offices</u> – The Corporation may have such additional offices at such other place within or without the State of New York as the Board of Directors may from time to time determine or as the business of the Corporation may require.

## ARTICLE II

### SHAREHOLERS' MEETING

     2.1    <u>Annual Meeting</u> – An annual meeting of shareholders shall be held within five (5) months after the close of the fiscal year of the Corporation on such date and at the time and place (either within or without the State of New York) as shall be fixed by the Board of Directors. At the annual meeting the shareholders shall elect Directors and transact such other business as may properly be brought before the meeting.

     2.2    <u>Special Meeting</u> – A special meeting of shareholders may be called at any time by the President and shall be called by the President at the request in writing of a majority of the Board of Directors then in office or at the request in writing filed with the Secretary by the holders of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of shareholders shall be confined to the purposes set forth in the notice thereof.

     2.3    <u>Notice of Meetings</u> – Notice of the time, place and purpose of every meeting of shareholders (and, if other than an annual meeting, the person or persons at whose discretion the meeting is being called), shall be given by the President, a Vice-President or by the Secretary to each shareholder of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting.  Notice of any meeting of shareholders may be written or electronic. If mailed, such notice is given when deposited in the United States mail, with first

class postage prepaid, directed to the shareholder at his address appearing on the stock book of the Corporation or at such other address supplied by him in writing to the Secretary of the Corporation for the purpose of receiving notice. If transmitted electronically, such notice is given when directed to the shareholder's electronic mail address as supplied by the shareholder to the Secretary of the Corporation or as otherwise directed pursuant to the shareholder's authorization or instructions.

A waiver of notice setting forth the purposes of the meeting for which notice is waived, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice, signed by the person or persons entitled to such notice. Waiver of notice may be written or electronic. If written, the notice must be signed by the shareholder or the shareholder's authorized Officer, Director, employee or agent by signing such waiver or causing his or her signature to be affixed to such waiver by any reasonable means, including, but not limited to, facsimile signature. If electronic, the transmission of the waiver must either set forth or be submitted with information from which it can reasonably be determined that the transmission was authorized by the shareholder. The attendance by a shareholder at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such shareholder.

All notice given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

2.4.   Quorum - The holders of a majority of the votes of shares of stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of shareholders except as otherwise provided by statute or the Certificate of Incorporation. If, however, a quorum shall not be present or represented at any meeting of shareholders, the shareholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any shareholders.

2.5.   Voting - Every shareholder of record entitled to vote at any meeting shall be entitled to one vote for each share of stock entitled to vote and held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any corporate action, other than the election of Directors, shall be authorized by a majority of the votes cast in favor of or against such action by the holders of shares entitled to vote thereon except as may otherwise be provided by statute or the Certificate of Incorporation. An abstention shall not count as a vote cast.

2.6.   Proxies - Every proxy shall be valid only if filed with the Secretary of the Corporation or with the Secretary of the meeting prior to the commencement of voting on the

matter in regard to which said proxy is to be voted.  No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by Section 609 of the Business Corporation Law.  Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the shareholder who executed such proxy and the revocation is filed with the Secretary of the Corporation or with the Secretary of the Meeting prior to the voting of the proxy.

A shareholder may execute a writing authorizing another person or persons to act for him as proxy.  Execution may be accomplished by the shareholder or its authorized Officer, Director, employee or agent signing such writing or causing his or her signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature.  A shareholder may authorize another person or persons to act for the shareholder as proxy by electronic transmission to the person who will be the holder of the proxy or to an agent duly authorized by the proxyholder to receive such transmission.  Any such electronic transmission must set forth or be submitted with sufficient information from which it can be reasonably determined that the electronic transmission was authorized by the shareholder.  The information relied upon by the inspectors or other persons making the determination shall be specified.

Any copy, facsimile or other reliable reproduction of the writing or transmission created pursuant to this section may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the original document.

2.7.    Shareholders' List - A list of shareholders as of the record date, certified by the Secretary of the Corporation or by a transfer agent appointed by the Board of Directors shall be prepared for every meeting of shareholders and shall be produced by the Secretary or some other Officer of the Corporation thereat.

2.8.    Inspectors at Meetings - In advance of any shareholders' meeting, the Board of Directors may appoint one or more inspectors to act at the meeting or at any adjournment thereof and if not so appointed or if the persons so appointed are unable to act, the person presiding at any such meeting may appoint one or more inspectors.  Each inspector, before entering upon the discharge of his duties as set forth in Section 611 of the Business Corporation Law, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of his ability.

2.9.    Conduct of Meeting - All meetings of shareholders shall be presided over by the President, or if he is not present, by a Vice-President, or if neither the President nor any Vice-President is present, by a chairman thereby chosen by the shareholders at the meeting.  The Secretary of the Corporation, or in his absence, an Assistant Secretary, shall act as secretary of every meeting but if neither the Secretary nor the Assistant Secretary is present, the chairman of the meeting shall appoint any person present to act as secretary of the meeting.

2.10.   Action Without Meeting - Any action required or permitted to be taken by the Shareholders thereof may be taken without a meeting if all Shareholders entitled to vote thereon consent in writing to the adoption of a resolution authorizing the action except as otherwise permitted by the Certificate of Incorporation.

No written consent shall be effective to take the corporate action referred to therein unless, within sixty days of the earliest dated consent delivered in the manner required by this paragraph to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to, its registered office in this state, its principal lace of business, or an Officer or agent of the Corporation having custody of the book in which proceedings of meetings of shareholders are recorded.   Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Any one or more members of the Board of Directors or of any committee thereof may participate in a meeting of said Board or of any such committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time, and participation by such means shall constitute presence in person at the meeting.

## ARTICLE III

## BOARD OF DIRECTORS

3.1.   Function and Definition - The business and property of the Corporation shall be managed by its Board of Directors who may exercise all the powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws directed or required to be exercised or done by the shareholders.

3.2.   Number and Qualification - The number of Directors constituting the entire Board shall not be less than one nor more than ( three ), as may be fixed by resolution of the Board of Directors or by the shareholders entitled to vote for the election of Directors, provided that any such action of the Board shall require the vote of a majority of the entire Board.   The phrase "Entire Board" as used herein means the total number of Directors which the Corporation would have if there were no vacancies.   Unless and until a different number shall be so fixed within the limits above specified, the Board shall consist of one (1) Director.   The term of any incumbent Director shall not be shortened by any such action by the Board of Directors or by the shareholders.

Each Director shall be at least eighteen years of age.

3.3.   Election Term and Vacancies - Except as otherwise provided in this Section, all Directors shall be elected at the annual meeting of shareholders and all Directors who are so elected or who are elected in the interim to fill vacancies and newly created directorships, shall hold office until the next annual meeting of shareholders and until their respective successors have been elected and qualified.

-4-

The members of the Board of Directors shall be elected by a majority of the votes cast at a meeting of shareholders, by the holders of shares entitled to vote, except as otherwise provided in the Certificate of Incorporation.

In the interim between annual meetings of shareholders, newly created directorships resulting from an increase in the number of Directors or from vacancies occurring in the Board, but not, except as hereinafter provided, in the case of a vacancy occurring by reason of removal of a Director by the shareholders, may be filled by the vote of a majority of the Directors, then remaining in office, although less than a quorum may exist.

In the case of a vacancy occurring in the Board of Directors by reason of the removal of one or more Directors by action of the shareholders, such vacancy may be filled by the shareholders at a special meeting duly called for such purpose.

In the event a vacancy is not filled by such election by shareholders, whether or not the vacancy resulted from the removal of a Director with or without cause, a majority of the Directors then remaining in office, although less than a quorum, may fill any such vacancy.

3.4.     Removal - The Board of Directors may, at any time, with cause, remove any Director.

The shareholders entitled to vote for the election of Directors may, at any time, remove any or all of the Directors with or without cause.

3.5.     Meetings - The annual meeting of the Board of Directors for the election of Officers and the transaction of such other business as may come before the meeting, shall be held, without notice, immediately following the annual meeting of shareholders, at the same place at which such shareholders' meeting is held.

Regular meetings of the Board of Directors shall be held at such time and place, within or outside the State of New York as shall be fixed by resolution of the Board, and when so fixed no further notice thereof need be given.  Regular meetings not fixed by resolution of the Board may be held on notice at such time and place as shall be determined by the Board.

Special meetings of the Board of Directors may be called on notice at any time by the President, and shall be called by the President at the written request of a majority of the Directors then in office.

3.6.     Notice of Meetings - In the case of all special meetings and of regular meetings not fixed by resolution of the Board, written notice of the time and place of each such meeting shall be mailed to each Director, addressed to his residence or usual place of business, not less than five days before the date on which such meeting is to be held, or shall be sent to such address by telegram, or be given personally, or by telephone, not less than one day before the date on which such meeting is to be held.  The notice of the meeting need not specify the purpose of the meeting.

Any meeting of the Board of Directors for which notice is required by these By-Laws or by statute need not be given to any Director who submits a signed Waiver of Notice whether before or after the meeting, or who attends the meeting without protesting prior thereto or at its commencement the lack of notice to him.  All signed Waivers of Notice shall be filed with the minutes of the meeting.

3.7.    Conduct of Meetings - The President, if present, shall preside at all meetings of Directors.  At all meetings at which the President is not present any other Director chosen by the Board shall preside.

3.8.    Quorum, Adjournment, Voting - Except as otherwise provided by the Certificate of Incorporation, a majority of the entire Board shall be requisite and shall constitute a quorum at all meetings of the Board of Directors for the transaction of business.  Where a vacancy or vacancies prevents such majority, a majority of the Directors then in office shall constitute a quorum.

A majority of the Directors present at any meeting, whether or not a quorum is present, may adjourn the meeting to another time and place without further notice other than an announcement at the meeting.

Except as otherwise provided by the Certificate of Incorporation, when a quorum is present at any meeting, a majority of the Directors shall decide any questions brought before such meeting and the act of such majority shall be the act of the Board.

3.9.    Action Without Meeting - Any action required or permitted to be taken by the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or of any committee thereof consent in writing to the adoption of a resolution authorizing the action.

Any one or more members of the Board of Directors or of any committee thereof may participate in a meeting of said Board or of any such committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time, and participation by such means shall constitute presence in person at the meeting.

3.10.    Compensation of Directors - Directors, as such, shall not receive any stated salary for their services, but, by resolution of the Board, a fixed sum and expenses of attendance, if any, may be allowed for attendance at any meeting of the Board of Directors or of any committee thereof.  Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving reasonable compensation therefor.

3.11.    Committees - The Board of Directors, by resolution of a majority of the entire Board, may designate from among its members one or more committees, each consisting of one or more Directors, and each of which, to the extent provided in such resolution, shall have all the authority of the Board except that no such committee shall have authority as to any of the following matters:

(a)     The submission to shareholders of any action as to which shareholders' authorization is required by statute, the Certificate of Incorporation or by these By-Laws;

(b)     The filling of vacancies in the Board of Directors or in any committee thereof;

(c)     The fixing of compensation of the Directors for serving on the Board or on any committee thereof;

(d)     The amendment or repeal of these By-Laws or the adoption of new By-Laws; and

(e)     The amendment or repeal of any resolution of the Board of Directors which by its terms shall not be so amendable or repealable.

The Board may designate one or more Directors as alternate members of any such committee who may replace any absent member or members at any meeting of such committee.

Each such committee shall serve at the pleasure of the Board.  The Board of Directors shall have the power at any time to fill vacancies in, to change the membership of, or to discharge any such committee.  Committees shall keep minutes of their proceedings and shall report the same to the Board of Directors at the meeting of the Board next succeeding, and any action by the committee shall be subject to revision and alteration by the Board of Directors, provided that no rights of a third party shall be affected in any such revision or alteration.

## ARTICLE IV

## OFFICERS

4.1.     Executive Officers - The Officers of the Corporation shall be a President, one or more Vice-Presidents, a Treasurer and a Secretary and such Assistant Treasurers and Assistant Secretaries and other Officers as the Board of Directors may determine.  Any two or more offices may be held by the same person.  In the event all of the issued and outstanding shares of capital stock of the Corporation are owned by one person, such person may hold all or any combination of offices.

4.2.     Election - The President shall be chosen from among the Directors and together with one or more Vice-Presidents, the Treasurer and Secretary shall be elected by the Board of Directors to hold office until the meeting of the Board held immediately following the next annual meeting of share-holders and shall hold office for the term for which elected and until their successors have been elected and qualified.  The Board of Directors may from time to time appoint all such other Officers as it may determine and such Officers shall hold office from the time of their appointment and qualifications until the time at which their successors are appointed and qualified.  A vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Directors.

4.3.     Removal - Any Officer may be removed from office by the Board at any time with or without cause.

4.4.   Delegation of Powers - The Board of Directors may from time to time delegate the power or duties of any Officer of the Corporation, in the event of his absence or failure to act otherwise, to any other Officer or Director or person whom they may select.

4.5.   Compensation - The compensation of each Officer shall be such as the Board of Directors may from time to time determine.

4.6.   President - The President shall be the chief executive Officer of the Corporation and shall have general charge of the business and affairs of the Corporation, subject, however, to the right of the Board of Directors to confer specified powers on Officers and subject generally to the direction of the Board.

Unless otherwise ordered by the Board of Directors, the President, or in the event of his inability to act, a Vice-President designated by the Board, shall have full power and authority on behalf of the Corporation to attend and to act and to vote at any meeting of security holders of Corporations in which the Corporation may hold securities, and at such meetings shall possess and may exercise any and all rights and powers incident to the ownership of such securities, and which, as the owner thereof, the Corporation might have possessed and exercised, if present. The Board of Directors by resolution from time to time may confer like powers upon any other person or persons.

4.7.   Vice-President - The Vice-President shall have such powers and perform such duties as the Board of Directors may from time to time prescribe.  In the absence or inability of the President to perform his duties or exercise his powers, the Vice President or, if there be more than one, a Vice-President designated by the Board, shall exercise the powers and perform the duties of the President subject to the direction of the Board of Directors.

4.8.   Secretary - The Secretary shall keep the minutes of all meetings and record all votes of shareholders, the Board of Directors and committees in a book to be kept for that purpose.  He shall give or cause to be given any required notice of meetings of shareholders, the Board of Directors or any committee, and shall be responsible for preparing or obtaining from a transfer agent appointed by the Board, the list of shareholders required by Article II, Section 7 thereof.  He shall be the custodian of the seal of the Corporation and shall affix or cause to be affixed the seal to any instrument requiring it and attest the same and exercise the powers and perform the duties incident to the office of Secretary subject to the direction of the Board of Directors.

4.9.   Treasurer - Subject to the direction of the Board of Directors, the Treasurer shall have charge of the general supervision of the funds and securities of the Corporation and the books of account of the Corporation and shall exercise the powers and perform the duties incident to the office of the Treasurer.  If required by the Board of Directors, he shall give the Corporation a bond in such sum and with such sureties as may be satisfactory to the Board of Directors for the faithful discharge of his duties.

4.10.   Other Officers - All other Officers, if any, shall have such authority and shall perform such duties as may be specified from time to time by the Board of Directors.

## ARTICLE V

### RESIGNATIONS

Any Director or Officer of the Corporation or any member of any committee of the Board of Directors of the Corporation, may resign at any time by giving written notice to the Board of Directors, the President or the Secretary. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

## ARTICLE VI

### CERTIFICATES REPRESENTING SHARES

6.1.  Form of Certificates - Each shareholder shall be entitled to a certificate or certificates in such form as prescribed by the Business Corporation Law and by any other applicable statutes, which Certificate shall represent and certify the number, kind and class of shares owned by him in the Corporation. The Certificates shall be numbered and registered in the order in which they are issued and upon issuance the name in which each Certificate has been issued together with the number of shares represented thereby and the date of issuance shall be entered in the stock book of the Corporation by the Secretary or by the transfer agent of the Corporation. Each certificate shall be signed by the President or a Vice-President and countersigned by the Secretary or Assistant Secretary and shall be sealed with the Corporate Seal or a facsimile thereof. The signatures of the Officers upon a certificate may also be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar other than the Corporation itself or an employee of the Corporation. In case any Officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such Officer before the certificate is issued, such certificate may be issued by the Corporation with the same effect as if the Officer had not ceased to be such at the time of its issue.

6.2.  Consideration - A certificate representing shares shall not be issued until the amount of consideration therefor determined to be stated capital pursuant to Section 506 of the Business Corporation Law has been paid in the form of cash, services rendered, personal or real property or a combination thereof and consideration for the balance (if any) complying with paragraph (a) of Section 504 of the Business Corporation Law has been provided, except as provided in paragraphs (e) and (f) of Section 505 of the Business Corporation Law. Notwithstanding that such shares may be fully paid and nonassessable, the Corporation may place in escrow shares issued for a binding obligation to pay cash or other property or to perform future services, or make other arrangements to restrict the transfer of the shares, and may credit distributions in respect of the shares against the obligation, until the obligation is performed.

6.3.  Lost Certificates - The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation, alleged to have been lost, mutilated, stolen or destroyed, upon the making of an

affidavit of that fact by the person so claiming and upon delivery to the Corporation, if the Board of Directors shall so require, of a bond in such form and with such surety or sureties as the Board may direct, sufficient in amount to indemnify the Corporation and its transfer agent against any claim which may be made against it or them on account of the alleged loss, destruction, theft or mutilation of any such certificate or the issuance of any such new certificate.

6.4.    Fractional Share Interests - The Corporation may issue certificates for fractions of a share; or it may pay in cash the fair market value of fractions of a share as of the time when those entitled to receive such fractions are determined; or it may issue script in registered or bearer form over the manual or facsimile signature of an Officer of the Corporation or of its agent, exchangeable as therein provided for full shares, but such script shall not entitle the holder to any rights of a shareholder except as therein provided.

6.5.    Share Transfers - Upon compliance with provisions restricting the transferability of shares, if any, transfers of shares of the Corporation shall be made only on the share record of the Corporation by the registered holder thereof, or by his duly authorized attorney, upon the surrender of the certificate or certificates for such shares properly endorsed with payment of all taxes thereon.

6.6.    Record Date for Shareholders - For the purpose of determining the shareholders entitled to notice of, or to vote at any meeting of shareholders or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the shareholders entitled to receive payment or any dividend or the allotment of any rights, or for the purpose of any other action, the Board of Directors may fix, in advance, a date as the record date for any such determination of shareholders.  Such date shall not be more than sixty nor less than ten days before the date of any meeting nor more than sixty days prior to any action taken without a meeting, the payment of any dividend or the allotment of any rights, or any other action.  When a determination of shareholders of record entitled to notice of, or to vote at any meeting of shareholders has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Board fixes a new record date under this Section for the adjourned date.

6.7.    Shareholders of Record - The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of New York.

## ARTICLE VII

## STATUTORY NOTICES

The Board of Directors may appoint the Treasurer or any other Officer of the Corporation to cause to be prepared and furnished to shareholders entitled thereto any special financial notice and/or statement which may be required by Section 511, 516 and 520 of the Business Corporation Law or by any other applicable statute.

## ARTICLE VIII

## FISCAL YEAR

The fiscal year of the Corporation shall be fixed by the Board of Directors by resolution duly adopted, and, from time to time, by resolution duly adopted the Board of Directors may alter such fiscal year.

## ARTICLE IX

## CORPORATE SEAL

The Corporate seal shall have inscribed thereon the name of the Corporation, the year of its incorporation and the words "Corporate Seal" and "New York" and shall be in such form and contain such other words and/or figures as the Board of Directors shall determine.   The Corporate seal may be used by printing, engraving, lithographing, stamping or otherwise making, placing or affixing, or causing to be printed, engraved, lithographed, stamped or otherwise made, placed or affixed, upon any paper or document, by any process whatsoever, an impression, facsimile or other reproduction of said Corporate seal.

## ARTICLE X

## BOOKS AND RECORDS

There shall be maintained at the principal office of the Corporation books of account of all the Corporation's business and transactions.

There shall be maintained at the principal office of the Corporation or at the office of the Corporation's transfer agent a record containing the names and addresses of all shareholders, the number and class of shares held by such and the dates when they respectively became the owners of record thereof.

## ARTICLE XI

## INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS

Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a Director or Officer of the Corporation, or then serves or has served on behalf of the Corporation in such capacity at the request of the Corporation, shall be indemnified by the Corporation against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the laws of the State of New York.   Such right of

indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE XII

## __AMENDMENTS__

Subject to Section 613 of the Business Corporation Law, the shares entitled at the time to vote in the election of Directors and the Board of Directors by vote of a majority of the entire Board, shall have the power to amend or repeal these By-Laws, and to adopt new By-Laws, provided, however, that any by-law adopted, amended or repealed by the Board of Directors may be amended or repealed by a majority of the votes of the shares at the time entitled to vote thereon as herein provided. No amendment of the By-Laws pertaining to the election of Directors or the procedures for the calling and conduct of a meeting of shareholders shall affect the election of directors or the procedures for the calling or conduct in respect of any meeting of shareholders unless notice thereof is given to the shareholders as provided in Section 3 of Article II hereof.

Dated: September 5, 2017